# INTERSTATE COMMERCE COMMISSION *v.* BALTIMORE AND OHIO RAILROAD COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 889. Argued March 17, 18, 1892. — Decided May 16, 1892.

The issue by a railway company engaged in interstate commerce of a " party-rate ticket" for the transportation of ten or more persons from a place situated in one State or Territory to a place situated in another State or Territory, at a rate less than that charged to a single individual, for a like transportation on the same trip, does not thereby make " an unjust and unreasonable charge" against such individual within the meaning of § 1 of the act of February 4, 1887; to regulate commerce, 24 Stat. 379, c. 104; nor make an " unjust discrimination" against him within the meaning of § 2 of that act; nor give " an undue or unreasonable preference or advantage" to the purchasers of the party-rate ticket within the meaning of § 3.

Section 22 of that act, as amended by the act of March 2, 1889, 25 Stat. 855, 862, c. 382, § 9, provides that discriminations in favor of certain persons

therein named shall not be deemed unjust, but it does not forbid discriminations in favor of others under conditions and circumstances so substantially alike as to justify the same treatment.

So far as Congress, in the act to regulate commerce, adopted the language of the English Traffic Act, it is to be presumed that it had in mind the construction given by the English courts to the adopted language, and intended to incorporate it into the Statute.

THE court stated the case as follows:

This proceeding was originally instituted by the filing of a petition before the Interstate Commerce Commission by the Pittsburg, Cincinnati and St. Louis Railway Company against the Baltimore and Ohio Railroad Company, to compel the latter to withdraw from its lines of road, upon which business competitive with that of the petitioner was transacted, the so-called "party-rates," and to decline to give such rates in future upon such lines of road; also for an order requiring said company to discontinue the practice of selling excursion tickets at less than the regular rate, unless such rates were posted in its offices as required by law. The petition set forth that the two roads were competitors from Pittsburg westward; that the Baltimore and Ohio road had in operation upon its competing lines of road so-called "party-rates," whereby "parties of ten or more persons travelling together on one ticket will be transported over said lines of road between stations located thereon, at two cents per mile per capita, which is less than the rate for a single person; said rate for a single person being about three cents per mile."

There was another charge that the defendant was in the habit of selling excursion tickets without posting its rates for the same in its offices; but this charge was subsequently abandoned.

The answer of the Baltimore and Ohio Railroad Company admitted that it had at one time in effect the so-called "party-rates," but prior to the filing of the complaint had withdrawn said rates, not that it believed that they were illegal, but because it was claimed by other companies that said rates were put into effect in violation of an agreement between companies belonging to a certain association of which defend-

ant was a member. It further averred that said rates were in no way a violation of the act to regulate commerce, and were an accommodation to the public, necessary to the business of theatrical and other amusement companies, and that when the legality of such rates was properly raised for decision, it was prepared to defend the legality of the same. The answer further denied the right of the complainant to institute the proceeding, and prayed that the complaint might be dismissed.

The cause was heard before the Commission, which found "that so-called party-rate tickets, sold at reduced rates, and entitling a number of persons to travel together on a single ticket or otherwise, are not commutation tickets within the meaning of section 22 of the act to regulate commerce, and that when the rates at which such tickets for parties are sold are lower for each member of the party than rates contemporaneously charged for the transportation of single passengers between the same points, they constitute unjust discrimination, and are therefore illegal." It was ordered and adjudged "that the defendant, the Baltimore and Ohio Railroad Company, do forthwith wholly and immediately cease and desist from charging rates for the transportation over its lines of a number of persons travelling together in one party, which are less for each person than rates contemporaneously charged by said defendant under schedules lawfully in effect for the transportation of single passengers between the same points."

The defendant road having refused to obey this mandate, the Commission, on May 1, 1890, pursuant to section 16 of the Interstate Commerce Act, filed this bill in the Circuit Court of the United States for the Southern District of Ohio for a writ of injunction to restrain the defendant from continuing in its violation of the order of the Commission. The bill set up the proceedings which had theretofore been taken before the Commission, and set forth as its gravamen that the defendant had wholly disregarded and set at naught the authority and order of the Commission in that regard, and had wilfully and knowingly disobeyed said order, and had not ceased and desisted from allowing party-rates as it had been ordered to

do; and had upon divers occasions since the service of said order charged rates for the transportation over its lines of a number of persons travelling together in one party which were less for each person than rates contemporaneously charged under schedules lawfully in effect between the same points for the transportation of persons, citing a number of instances of such disobedience.

The answer admitted the proceedings set forth in the bill, but denied that it had been made to appear to the Commission that defendant had violated the provisions of the act to regulate commerce, or that the Commission had duly and legally determined the matters and things in controversy and at issue between the parties; and averred that several of the conclusions of fact stated in the report of the Commission were not true, or justified by the evidence produced at the hearing; and that the conclusions of law contained in the report, and the interpretation therein given to the act, were not correct. It admitted that it had not wholly ceased charging rates for transportation over its lines for a number of passengers travelling together in one party upon one ticket, which are less for each person than rates contemporaneously charged by it for the transportation of single passengers between the same points, and admitted a violation of the order of the Commission.

The seventh and eighth paragraphs of the answer are the material ones, and are here given in full:

"7. That for many years prior to the passage of the said 'Act to Regulate Commerce,' all the railroad carriers in the United States had habitually made a rate of charge for passengers making frequent trips, trips for long distances, and trips in parties of ten or more, lower than the regular single fare charged between the same points, and such lower rates were universally made at the date of the passage of said act. To carry on this universal practice many forms of tickets were employed to enable different classes of passengers to enjoy these lower rates, and so stimulate travel. To meet the needs of the commercial traveller the thousand-mile ticket was used; to meet the needs of the suburban resident or frequent traveller,

several forms of tickets were used, e.g. monthly or quarterly tickets, good for any number of trips within the specified time, and ten, twenty-five or fifty-trip tickets, good for the specified number of trips by one person, or for one trip by the specified number of persons; to accommodate parties of ten or more, a single ticket, one way or round trip, for the whole party, was made up by the agent on a skeleton form furnished for the purpose; to accommodate excursionists travelling in numbers too large to use a single ticket, special individual tickets were issued to each person. Tickets good for a specified number of trips were issued also between cities where travel was frequent. In short, it was an established principle of the business that whenever the amount of travel more than made up to the carrier for reduction of the charge per capita, then such reduction was reasonable and just in the interests both of the carrier and of the public. Long experience has proved the soundness of the principle. Under its application grew up the business of commercial travellers, the enormous suburban business, the constant travel between large cities, and the excursion business. Under its application has grown up also the business of travelling companies or parties, which has reached an aggregate of many hundreds of thousands of dollars, and which depends for its existence upon a continuance of the transportation rates under which it has grown up.

"8. That since the passage of the said 'act to regulate commerce,' this respondent has continued as theretofore the practice above stated, of making a lower charge on passenger travel, in consideration of the amount and frequency of the travel, and with that purpose and to accommodate the various classes of passengers, it has continued in use all the forms of ticket described in the next preceding section. That the charge fixed by it for the transportation of parties of ten or more, on a single ticket, has been two cents per mile per capita, which is the same rate charged on thousand-mile tickets, and is a higher rate than it charges on long-distance passenger travel, and excursion travel, and higher than its general rate for suburban travel on time or other suburban tickets. That the said charge for the transportation of parties on a

single ticket is just and reasonable, affording a fair compensa, tion to the carrier, and for the best interests both of the carrier and of the public, because any higher rate would destroy the business. That the business reasons, circumstances and conditions which induced this respondent to make such lower charge for the transportation of parties as aforesaid, and that make it the interest of this respondent as a carrier to make such lower charge, are precisely the same reasons, circumstances and conditions that induce it and make it its interest to fix a lower charge for the transportation of passengers buying mileage tickets, time or trip tickets, and excursionists. That while so-called party-rate tickets are used principally by travelling amusement companies, because no other form of ticket meets the requirement of such companies, yet this respondent has avoided confining such tickets to any class of business, by offering them on the same terms to the public at large. That this respondent has obviated the danger that such lower charge for parties might be taken advantage of by speculators or ticket brokers, by issuing only one ticket for the whole party. And respondent avers that, as such tickets are now issued by it they are not and cannot be used for speculative purposes, and afford no opportunity for evading the law in the hands of ticket brokers. This respondent further avers that it may rightly and legally make a charge per capita for persons travelling on said party-rate tickets, lower than its charge for a single passenger making one trip between the same points, the character, circumstances and conditions of the service being substantially different, and that the making of such lower charge per capita to the member of the party makes or gives no undue or unreasonable preference or advantage to him, and subjects no person, company, firm, corporation or locality, or particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

The answer further averred the illegality of the order of the Commission, and averred " that by the true construction of the act the second section thereof requires the same charge for transportation service only in cases where the commercial circumstances and conditions are substantially similar, and the

third section requires the same charge to be made only when a difference in charge would work a prejudice or disadvantage to some one without reason therefor. That the twenty-second section, so far from making exceptions to an otherwise absolute rule, was inserted merely as additional precaution to insure the giving to the second and third sections of the act the construction which Congress intended. That the twenty-second section is a legislative declaration; that under the provisions of the second section of the act, circumstances and conditions of a commercial nature are to be considered, and among such circumstances and conditions, in the case of passenger traffic, the amount of service purchased or contracted for, and the interest of the carrier in stimulating travel are to be considered."

Upon the hearing before the Circuit Court upon pleadings and proofs the bill was dismissed, separate opinions being delivered by Judges Jackson and Sage. 43 Fed. Rep. 37. From this decree the Interstate Commerce Commission appealed to this court. The provisions of the Interstate Commerce act, so far as the same are material to this case, are set forth in the margin.[1]

---

[1] AN ACT TO REGULATE COMMERCE.

" SEC. 1. That the provisions of this act shall apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management, or arrangement, for a continuous carriage or shipment from one State or Territory . . . to any other State or Territory. . . .

" All charges made for any service rendered, or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, or for the receiving, delivering, storage or handling of such property, shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful.

" SEC. 2. That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback or other device, charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous

*Mr. Samuel Shellabarger* and *Mr. Alfred G. Safford* (with whom were *Mr. Attorney General* and *Mr. J. M. Wilson* on the brief) for appellant.

Section 2 of the act is one creating a prohibition and rule of commerce not embraced in section 1, (prohibiting unreasonable charges,) and creates an offence that is not embraced in section 1.

The thing required by section 2 is *equality* in charges for like and contemporaneous service in transportation of persons or property. By the provisions, therefore, of this section, to

---

service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful.

"Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

"Sec. 22 as amended by the act of March 2, 1889, 25 Stat. 855, c. 382, § 9, p. 862. That nothing in this act shall prevent the carriage, storage or handling of property free or at reduced rates for the United States, State or municipal governments, or for charitable purposes, or to or from fairs and expositions for exhibition thereat, or the free carriage of destitute and homeless persons transported by charitable societies, and the necessary agents employed in such transportation, or the issuance of mileage, excursion or commutation passenger tickets; nothing in this act shall be construed to prohibit any common carrier from giving reduced rates to ministers of religion, or to municipal governments for the transportation of indigent persons, or to inmates of the National Homes or State Homes for Disabled Volunteer Soldiers, and of Soldiers' and Sailors' Orphan Homes, including those about to enter and those returning home after discharge, under arrangements with the boards of managers of said homes; nothing in this act shall be construed to prevent railroads from giving free carriage to their own officers and employés, or prevent the principal officers of any railroad company or companies from exchanging passes or tickets with other railroad companies for their officers and employés; and nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies: *Provided,* That no pending litigation shall in any way be affected by this act."

:harge for the same service, contemporaneously rendered, un-equal prices, is rendered unlawful, without regard to its being violative of the rule of justice and reasonableness of charge established by section 1.

It is therefore no answer to the proposition that party-rate tickets are prohibited by section 2, to say, or to show, that party-rate tickets are no more than just and reasonable and are merely fairly compensatory considered by themselves. *Messenger* v. *Pennsylvania· Railroad*, 37 N. J. Law, 531; *Chicago & Alton Railroad* v. *People*, 67 Illinois, 11; *Great Western Railway Co.* v. *Sutton*, L. R. 4·H. L. 226; *Parker* v. *Great Western Railway Co.*, 7 Man. & Grang. 253; *Crouch* v. *Railway Co.*, 9 Exch. 556; *Piddington* v. *Southeastern Railway*, 5 C. B. (N. S.) 111; *Garton* v. *Bristol & Exeter Railway*, 1 Best & Smith, 112; *Branley* v. *Southeastern Railway*, 12 C. B. (N. S.) 63; *Baxendale* v. *Great Western Railway*, 14 C. B. (N. S.) 1.

There cannot be, and there is not, the slightest doubt about this provision of the statute being one establishing a clear and peremptory rule of charge·applicable to all common carriers, and requiring absolute equality of charge in a designated case or class of cases.

What that case or class of cases is to which this positive and peremptory rule of all equality is inflexibly applicable, according to section 2, is also made as plain by the statute as words can make it. The service so subjected to this rule of equality is one which requires to have in it the following elements of sameness or identity. The two services contrasted must be:

(1) Like service; (2) They must be contemporaneous; (3) They must be in "a like kind of traffic;" (4) The services must be rendered "under substantially similar circumstances and conditions."

If the subject matter of the charge has in it these four elements of sameness, then neither the court below, nor, so far as we know, anybody else, has ever questioned that the statute makes the obligation·to make the charge equal, and the violation thereof a crime.

Now, apply this to the present case.   The service rendered by the carrier on the two classes of tickets — single and party-rate — are identical in the following elements: (1) The service is "like" in each case so far as it relates to the manner of rendering it, each being rendered by transportation in the same car; (2) The service is "like" in that it is rendered by carrying a passenger over the same identical line; (3) The service is "like" in their being carried in the same direction; (4) The service is "like" in that it is rendered at the same time; and (5) The service is "like" in that the subject of transportation is the same, to wit, a human being, or several such.

Then coming to the question of the identity or similarity of conditions.   The conditions of the service are "similar" in each and every one of the five particulars just enumerated in regard to the character of the services; and the conditions are similar in the following respects: (1) The conditions are "similar" so far as relates to the manner of rendering the services, each being rendered by transportation in the same car; (2) The conditions are "similar" in that the services are rendered by carrying a passenger, one or more; (3) The conditions are "similar" in that the services are rendered at the same time; (4) The conditions are "similar" in that the passengers are carried in the same direction and over the same line; (5) The conditions are "similar" in that the subject of transportation is the same, to wit, a human being.

Thus far on the question of "like" services and the "similarity" of conditions, there is, we apprehend, no difference of opinion.

The result, therefore, of this analysis is this, that the only difference between the two services, thus contrasted, is that the ticket upon which the "party-rate" passengers are carried is one covering more than one human being, and was purchased by one application or payment, and the persons represented by the ticket are alleged to be required to travel together, as one company; whereas, in the case of a single ticket, it represents but one person.   The question is thus reduced to this: Whether the transportation of two persons on one ticket differs from the transportation of two persons on two tickets,

on the same train? The court below held that it did. In this we submit that it erred.

How is the service itself, rendered by the carrier, changed in its intrinsic qualities by the fact that, in one case a ticket for one is bought, and in the other case a ticket for more than one? What is the difference either in the service rendered, or the conditions under which it was rendered? There is no difference.

Another view taken by the court below, which, we submit, was erroneous, is that this entire statute was intended to add, as between common carriers and their customers, nothing in the way of securing justice between the carrier and such customers, and also as between the several customers of the carrier, that is not secured to them by the common law; that, in so far as it defines and fixes rights and obligations as between the public and the carrier, it is simply declaratory of the common law, and adds no new rights or obligations, and only defines preëxisting rights and obligations, and adds facilities for enforcing them. If by this is meant the common law as declared to be in such cases as *Railroad Co.* v. *People,* 67 Illinois, 11, and *Messenger* v. *Pennsylvania Railroad Co.,* 36 N. J. Law, 407, we have no controversy on this point. But if it means the common law as declared in *Great Western Railway Co.* v. *Sutton,* L. R. 4 H. L. 226, which holds that, by such common law, "like services" under similar conditions must be compensated "reasonably," and no more, but not necessarily "equally," then we do most confidently submit that such position is erroneous; and, if enforced, virtually repeals, in all of its essential provisions, the interstate commerce law.

Reduced to its exact substance, this position of the court is that neither section 2, nor any other section establishes any rule of "equality" of charge, and leaves all, as the court assumes it was at common law, a subject matter to be contracted about; subject to no other limitation than that "unjust discrimination" should not be made. And having thus abolished section 2, or robbed it of all signification in the way of prohibition of inequality, the court concludes that section 22 is not "exceptive" in its nature; but is, as the court says, "in-

serted merely as an enumeration of a class of persons and things not within either the letter or spirit of the interstate commerce act, which it would be lawful to discriminate in favor of without its being so provided in section 22." This emasculates the entire act, and renders it utterly insignificant and worthless, except in so far as it may turn out to be useful in securing the enforcement of the obligations established by the common law.

Neither in England nor in the States in this country where equality clauses are inserted in the statutes, has this position been adopted. *Great Western Railway Co.* v. *Sutton, ubi supra; Atchison, Topeka &c. Railroad* v. *Denver & New Orleans Railroad,* 110 U. S. 667, 684. In the latter case it was held that these English statutes added new remedies and rights of action securing equality of charge which did not before exist, according to this English view of what was the common law.

This court has, in a recent case, repeated what it has in substance often held before, namely, that after a statute has received from the courts its final and settled interpretation, the construction becomes, in effect for purposes of interpretation, a part of the statute itself as much as if such interpretation were embodied in the words of the act; and if that statute is adopted by future legislatures after its meaning is thus judicially settled by the highest courts of the country, then it will be assumed and presumed by the courts, in construing that new law, that it was the design of the legislature that the statute should have the same meaning under the reënactment that the courts had given to it before the reënactment. *German Bank* v. *Franklin County,* 128 U. S. 538; *Douglass* v. *Pike County,* 101 U. S. 677, 686, 687.

Applying that rule to this case, the equality clauses in the English statute had, when the Interstate Commerce Act was enacted, received this interpretation: "When it is sought to show that a charge is extortionate, as being contrary to the statutable obligation to charge equally, it is immaterial whether the charge is reasonable or not; it is enough to show that the company carried for some other person or class of

persons at a lower charge, during the period throughout which the party complaining was charged more under like circumstances. *Great Western Railway Co.* v. *Sutton, ubi supra.*

It must therefore be assumed that the equality clause found in section 2 of this act is a law; that it is a law which means what it says, and that it does peremptorily require equality of charge for substantially "like" service, rendered under substantially "similar" conditions, and that it is a new and additional obligation created by statute that can never be whistled down or contracted away as against the public, according to the discretion of the carrier and the party with whom he deals. And it being already established that there is no substantial difference in the service rendered on the sale of one ticket to transport ten persons on a given train, and that rendered on the sale of one ticket to transport one person on the same train, which would entitle the company to make a difference in the rate, that would seem to dispose of this branch of the case.

Mr. John K. Cowen and Mr. Hugh L. Bond, Jr., for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

Prior to the enactment of the act of February 4, 1887, to regulate commerce, commonly known as the Interstate Commerce Act, 24 Stat. 379, c. 104, railway traffic in this country was regulated by the principles of the common law applicable to common carriers, which demanded little more than that they should carry for all persons who applied, in the order in which the goods were delivered at the particular station, and that their charges for transportation should be reasonable. It was even doubted whether they were bound to make the same charge to all persons for the same service; *Fitchburg Railroad Co.* v. *Gage,* 12 Gray, 393; *Baxendale* v. *Eastern Counties Railway Co.,* 4 C. B. (N. S.) 63; *Great Western Railway Co.* v. *Sutton,* L. R. 4 H. L. 226, 237; *Ex parte Benson,* 18 South Car. 38; *Johnson* v. *Pensacola Railway Co.,* 16 Florida, 623;

though the weight of authority in this country was in favor of an equality of charge to all persons for similar services. In several of the States acts had been passed with the design of securing the public against unreasonable and unjust discriminations; but the inefficacy of these laws beyond the lines of the State, the impossibility of securing concerted action between the legislatures toward the regulation of traffic between the several States, and the evils which grew up under a policy of unrestricted competition, suggested the necessity of legislation by Congress under its constitutional power to regulate commerce among the several States. These evils ordinarily took the shape of inequality of charges made, or of facilities furnished, and were usually dictated by or tolerated for the promotion of the interests of the officers of the corporation or of the corporation itself, or for the benefit of some favored persons at the expense of others, or of some particular locality or community, or of some local trade or commercial connection, or for the destruction or crippling of some rival or hostile line.

The principal objects of the Interstate Commerce Act were to secure just and reasonable charges for transportation; to prohibit unjust discriminations in the rendition of like services under similar circumstances and conditions; to prevent undue or unreasonable preferences to persons, corporations or localities; to inhibit greater compensation for a shorter than for a longer distance over the same line; and to abolish combinations for the pooling of freights. It was not designed, however, to prevent competition between different roads, or to interfere with the customary arrangements made by railway companies for reduced fares in consideration of increased mileage, where such reduction did not operate as an unjust discrimination against other persons travelling over the road. In other words, it was not intended to ignore the principle that one can sell at wholesale cheaper than at retail. It is not all discriminations or preferences that fall within the inhibition of the statute; only such as are unjust or unreasonable. For instance, it would be obviously unjust to charge A a greater sum than B for a single trip from Washington to Pittsburg;

but if A agrees not only to go but to return by the same route, it is no injustice to B to permit him to do so for a reduced fare, since the services are not alike, nor the circumstances and conditions substantially similar, as required by section 2 to make an unjust discrimination. Indeed, the possibility of just discriminations and reasonable preferences is recognized by these sections, in declaring what shall be deemed unjust. We agree, however, with the plaintiff in its contention that a charge may be perfectly reasonable under section 1, and yet may create an unjust discrimination or an unreasonable preference under sections 2 and 3. As was said by Mr. Justice Blackburn in *Great Western Railway Co.* v. *Sutton,* L. R. 4 H. L. 226, 239: "When it is sought to show that the charge is extortionate as being contrary to the statutable obligation to charge equally, it is immaterial whether the charge is reasonable or not; it is enough to show that the company carried for some other person or class of persons at a lower charge during the period throughout which the party complaining was charged more under the like circumstances."

The question involved in this case is, whether the principle above stated as applicable to two individuals applies to the purchase of a single ticket covering the transportation of ten or more persons from one place to another. These are technically known as party-rate tickets, and are issued principally to theatrical and operatic companies for the transportation of their troupes. Such ticket is clearly neither a "mileage" nor an "excursion" ticket within the exception of section 22; and upon the testimony in this case it may be doubtful whether it falls within the definition of "commutation tickets," as those words are commonly understood among railway officials. The words "commutation ticket" seem to have no definite meaning. They are defined by Webster (edition of 1891) as "a ticket, as for transportation, which is the evidence of a contract for service at a reduced rate." If this definition be applicable here, then it is clear that it would include a party-rate ticket. In the language of the railway, however, they are principally, if not wholly, used to designate tickets for transportation during a limited time between neighboring

towns or cities and suburban towns. The party-rate ticke upon the defendant's road is a single ticket issued to a part of ten or more, at a fixed rate of two cents per mile, or a dis count of one-third from the regular passenger rate. Th reduction is not made by way of a secret rebate or drawback but the rates are scheduled, posted and open to the public a large.

But, assuming the weight of evidence in this case to be tha the party-rate ticket is not a "commutation ticket," as thal word was commonly understood at the time of the passage ol the act, but is a distinct class by itself, it does not necessarily follow that such tickets are unlawful. The unlawfulness defined by sections 2 and 3 consists either in an "unjust dis crimination" or an "undue or unreasonable preference or advantage," and the object of section 22 was to settle beyond all doubt that the discrimination in favor of certain persons therein named should not be deemed unjust. It does not follow, however, that there may not be other classes of per sons in whose favor a discrimination may be made without such discrimination being unjust. In other words, this sec tion is rather illustrative than exclusive. Indeed, many, if not all, the excepted classes named in section 22 are those which, in the absence of this section, would not necessarily be held the subjects of an unjust discrimination, if more favora ble terms were extended to them than to ordinary passengers. Such, for instance, are property of the United States, state or municipal governments; destitute and homeless persons trans ported free of charge by charitable societies; indigent persons transported at the expense of municipal governments; inmates of soldiers' homes, etc., and ministers of religion, in favor of whom a reduction of rates had been made for many years before the passage of the act. It may even admit of serious doubt whether, if the mileage, excursion or commutation tickets had not been mentioned at all in this section, they would have fallen within the prohibition of sections 2 and 3. In other words, whether the allowance of a reduced rate to persons agreeing to travel one thousand miles, or to go and return by the ame road, is a "like and contemporaneous service under

substantially similar conditions and circumstances" as is rendered to a person who travels upon an ordinary single-trip ticket. If it be so, then, under state laws forbidding unjust discriminations, every such ticket issued between points within the same State must be illegal. In view of the fact, however, that every railway company issues such tickets; that there is no reported case, state or federal, wherein their illegality has been questioned; that there is no such case in England; and that the practice is universally acquiesced in by the public, it would seem that the issuing of such tickets should not be held an unjust discrimination or an unreasonable preference to the persons travelling upon them.

But whether these party-rate tickets are commutation tickets proper, as known to railway officials or not, they are obviously within the commuting principle. As stated in the opinion of Judge Sage in the court below : "The difference between commutation and party-rate tickets is, that commutation tickets are issued to induce people to travel more frequently, and party-rate tickets are issued to induce more people to travel. There is, however, no difference in principle between them, the object in both cases being to increase travel without unjust discrimination, and to secure patronage that would not otherwise be secured."

The testimony indicates that for many years before the passage of the act it was customary for railroads to issue tickets at reduced rates to passengers making frequent trips, trips for long distances, and trips in parties of ten or more, lower than the regular single fare charged between the same points; and such lower rates were universally made at the date of the passage of the act. As stated in the answer, to meet the needs of the commercial traveller the thousand-mile ticket was issued; to meet the needs of the suburban resident or frequent traveller, several forms of tickets were issued. For example, monthly or quarterly tickets, good for any number of trips within the specified time; and ten, twenty-five or fifty-trip tickets, good for a specified number of trips by one person, or for one trip by a specified number of persons; to accommodate parties of ten or more, a single ticket, one way or round trip,

for the whole party, was made up by the agent on a skeleton
form furnished for that purpose; to accommodate excursion-
ists travelling in parties too large to use a single ticket, special
individual tickets were issued to each person. Tickets good
for a specified number of trips were also issued between cities
where travel was frequent. In short, it was an established
principle of the business, that whenever the amount of travel
more than made up to the carrier for the reduction of the
charge per capita, then such reduction was reasonable and just
in the interests both of the carrier and of the public. Although
the fact that railroads had long been in the habit of issuing
these tickets would be by no means conclusive evidence that
they were legal, since the main purpose of the act was to put
an end to certain abuses which had crept into the management
of railroads, yet Congress may be presumed to have had those
practices in view, and not to have designed to interfere with
them, except so far as they were unreasonable in themselves
or unjust to others. These tickets then being within the com-
mutation principle of allowing reduced rates in consideration
of increased mileage, the real question is, whether this operates
as an undue or unreasonable preference or advantage to this
particular description of traffic, or an unjust discrimination
against others. If, for example, a railway makes to the public
generally a certain rate of freight, and to a particular individ-
ual residing in the same town a reduced rate for the same
class of goods, this may operate as an undue preference, since
it enables the favored party to sell his goods at a lower price
than his competitors, and may even enable him to obtain a
complete monopoly of that business. Even if the same re-
duced rate be allowed to every one doing the same amount of
business, such discrimination may, if carried too far, operate
unjustly upon the smaller dealers engaged in the same busi-
ness, and enable the larger ones to drive them out of the
market.

The same result, however, does not follow from the sale of
a ticket for a number of passengers at a less rate than for a
single passenger; it does not operate to the prejudice of the
single passenger, who cannot be said to be injured by the fact

that another is able in a particular instance to travel at a less rate than he. If it operates injuriously toward any one it is the rival road, which has not adopted corresponding rates; but, as before observed, it was not the design of the act to stifle competition, nor is there any legal injustice in one person procuring a particular service cheaper than another. If it be lawful to issue these tickets, then the Pittsburg, Chicago and St. Louis Railway Company has the same right to issue them that the defendant has, and may compete with it for the same traffic; but it is unsound to argue that it is unlawful to issue them because it has not seen fit to do so. Certainly its construction of the law is not binding upon this court. The evidence shows that the amount of business done by means of these party-rate tickets is very large; that theatrical and operatic companies base their calculation of profits to a certain extent upon the reduced rates allowed by railroads; and that the attendance at conventions, political and religious, social and scientific, is, in a great measure, determined by the ability of the delegates to go and come at a reduced charge. If these tickets were withdrawn, the defendant road would lose a large amount of travel, and the single-trip passenger would gain absolutely nothing. If a case were presented where a railroad refused an application for a party-rate ticket upon the ground that it was not intended for the use of the general public, but solely for theatrical troupes, there would be much greater reason for holding that the latter were favored with an undue preference or advantage.

In order to constitute an unjust discrimination under section 2, the carrier must charge or receive directly from one person a greater or less compensation than from another, or must accomplish the same thing indirectly by means of a special rate, rebate or other device; but in either case it must be for a "like and contemporaneous service in the transportation of a like kind of traffic, under substantially similar circumstances and conditions." To bring the present case within the words of this section, we must assume that the transportation of ten persons on a single ticket is substantially identical with the transportation of one, and, in view of the universally accepted

fact that a man may buy, contract, or manufacture on a large scale cheaper proportionately than upon a small scale, this is impossible.

In this connection we quote with approval from the opinion of Judge Jackson in the court below: "To come within the inhibition of said sections, the differences must be made under like conditions; that is, there must be contemporaneous service in the transportation of like kinds of traffic under substantially the same circumstances and conditions. In respect to passenger traffic, the positions of the respective persons, or classes, between whom differences in charges are made, must be compared with each other, and there must be found to exist substantial identity of situation and of service, accompanied by irregularity and partiality resulting in undue advantage to one, or undue disadvantage to the other, in order to constitute unjust discrimination."

The English Traffic Act of 1854 contains a clause similar to section 3 of the Interstate Commerce Act, that "no such company shall make or give any undue or unreasonable preference or advantage to or in favor of any particular person or company, or any particular description of traffic, in any respect whatsoever, nor shall any such company subject any particular person or company, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

In *Hozier* v. *Caledonian Railway*, 17 Sess. Cas. (2d Series) 302, (*S. C.* 1 Nev. & Macn. Railway Cases, 27,) complaint was made by one who had frequent occasion to travel, that passengers from an intermediate station between Glasgow and Edinburgh were charged much greater rates to those places than were charged to other through passengers between these termini; but the Scotch Court of Session held that the petitioner had not shown any title or interest to maintain the proceeding; his only complaint being that he did not choose that parties travelling from Edinburgh to Glasgow should enjoy the benefit of a cheaper rate of travel than he himself could enjoy. "It provides," said the court, "for giving undue preference to parties *pari passu* in the matter, but you must bring them into

competition in order to give them an interest to complain."
This is in substance holding that the allowance of a reduced
through rate worked no injustice to passengers living on the
line of the road, who were obliged to pay at a greater rate.
So, in *Jones* v. *Eastern Counties Railway*, 3 C. B. (N. S.) 718,
the court refused an injunction to compel a railway company
to issue season tickets between Colchester and London upon
the same terms as they issued them between Harwich and
London, upon the mere suggestion that the granting the latter,
the distance being considerably greater, at a much lower rate
than the former, was an undue and unreasonable preference
of the inhabitants of Harwich over those of Colchester. Upon
the other hand, in *Ransome* v. *Eastern Counties Railway*, 1
C. B. (N. S.) 437, where it was manifest that a railway com-
pany charged Ipswich merchants, who sent from thence coal
which had come thither by sea, a higher rate for the carriage
of their coal than they charged Peterboro' merchants, who had
made arrangements with them to carry large quantities over
their lines, and that the sums charged the Peterboro' merchants
were fixed so as to enable them to compete with the Ipswich
merchants, the court granted an injunction, upon the ground
of an undue preference to the Peterboro' merchants, the object
of the discrimination being to benefit the one dealer at the
expense of the other, by depriving the latter of the natural
advantages of his position. In *Oxlade* v. *Northeastern Rail-
way*, 1 C. B. (N. S.) 454, a railway company was held justified
in carrying goods for one person for a less rate than that at
which they carried the same description of goods for another,
if there be circumstances which render the cost of carrying the
goods for the former less than the cost of carrying them for
the latter, but that a desire to introduce northern coke into a
certain district was not a legitimate ground for making special
agreements with different merchants for the carriage of coal
and coke at a rate lower than the ordinary charge, there being
nothing to show that the pecuniary interests of the company
were affected; and that this was an undue preference.

In short, the substance of all these decisions is that railway
companies are only bound to give the same terms to all per-

sons alike under the same conditions and circumstances, and that any fact which produces an inequality of condition and a change of circumstances justifies an inequality of charge. These traffic acts do not appear to be as comprehensive as our own, and may justify contracts which with us would be obnoxious to the long and short haul clause of the act, or would be open to the charge of unjust discrimination. But so far as relates to the question of "undue preference," it may be presumed that Congress, in adopting the language of the English act, had in mind the constructions given to these words by the English courts, and intended to incorporate them into the statute. *McDonald* v. *Hovey*, 110 U. S. 619.

There is nothing in the objection that party-rate tickets afford facilities for speculation and that they would be used by ticket brokers or "scalpers" for the purpose of evading the law. The party-rate ticket, as it appears in this case, is a single ticket covering the transportation of ten or more persons, and would be much less available in the hands of a ticket broker than an ordinary single ticket, since it could only be disposed of to a person who would be willing to pay two-thirds of the regular fare for that number of people. It is possible to conceive that party-rate tickets may, by a reduction of the number for whom they may be issued, be made the pretext for evading the law, and for the purpose of cutting rates, but should such be the case, the courts would have no difficulty in discovering the purpose for which they were issued, and applying the proper remedy.

Upon the whole, we are of the opinion that party-rate tickets, as used by the defendant, are not open to the objections found by the Interstate Commerce Commission, and are not in violation of the act to regulate commerce, and the decree of the court below is, therefore,

*Affirmed.*