**SEA–LAND SERVICE, INC., Appellant,**

v.

**Richard J. DANZIG, Secretary of the Navy, Appellee.**

**No. 99–1124.**

United States Court of Appeals, Federal Circuit.

May 8, 2000.

Raymond S.E. Pushkar, McKenna & Cuneo, L.L.P., of Washington, DC, argued for appellant. With him on the brief was Michael A. Hopkins. Of counsel on the brief was James P. Moore, Sea–Land Service, Inc., of Arlington, Virginia.

Steve J. Gillingham, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With him on the brief were David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director; and Kirk T. Manhardt, Assistant Director. Of counsel was Daniel Wentzell, Office of Counsel, Military Sealift Command, Department of the Navy, of Washington, DC; and Charna J. Swedarsky, Office of Counsel, Military Sealift Command, Department of the Navy, of Washington, DC.

John Longstreth and Rolf Marshall, Preston Gates Ellis & Rouvelas Meeds, LLP, of Washington, DC for Amicus Curiae The Transportation Institute.

Robert T. Basseches, Shea & Gardner, of Washington, DC, for Amici Curiae American President Lines, Ltd, et al.

Before LOURIE, RADER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This is a government contract case. The contract at issue was between the Navy's Military Sealift Command (MSC) and Sea–Land Service, Inc., for the shipment of military supplies to and from the Middle East during the Gulf War. After performance of the contract was completed, MSC claimed that the rates that Sea–Land charged to transport certain cargo under the contract violated the McCumber Amendment to the Cargo Preference Act of 1904, 10 U.S.C. § 2631, because Sea–Land's rates for transporting that cargo were greater than the rates Sea–Land charged private shippers to transport like goods. Sea–Land challenged MSC's right to recoupment, but the Armed Services Board of Contract Appeals upheld MSC's claim.

I

The McCumber Amendment was first enacted as a proviso to the Cargo Preference Act of 1904. As currently codified, the Cargo Preference Act reads as follows, with the McCumber Amendment emphasized:

> Only vessels of the United States or belonging to the United States may be used in the transportation by sea of supplies bought for the Army, Navy, Air Force, or Marine Corps. However, if

the President finds that the freight charged by those vessels is excessive or otherwise unreasonable, contracts for transportation may be made as otherwise provided by law. *Charges made for the transportation of those supplies by those vessels may not be higher than the charges made for transporting like goods for private persons.*

10 U.S.C. § 2631.

■ The purpose underlying the Cargo Preference Act was to help U.S. carriers meet foreign competition by giving them a preference in transporting military goods. *See Curran v. Laird,* 420 F.2d 122, 127 (D.C.Cir.1969). Congress was concerned, however, that the statutory preference could enable U.S. carriers to hold the United States Treasury hostage by charging exorbitant rates. Two provisions were added to the statute to guard against that possibility. The first authorized the President to disregard the statutory preference if he found that domestic carriers were imposing excessive or unreasonable charges for transporting military freight. The second, the McCumber Amendment, prohibited U.S. carriers from charging higher rates to the military than to private shippers for transporting like goods.

## II

In August 1990, MSC issued a request for proposals for cargo transportation services to support U.S. military activities in the Persian Gulf area. The request for proposals asked the carriers to quote separate rates for the port-to-port and inland shipping components of the transportation. The port-to-port rates would govern all port-to-port shipping, and the port-to-port and inland rates would be combined to produce the total charge for all transportation having an inland component.

MSC awarded a contract to Sea–Land, as well as to every other carrier that submitted a bid. The contracts were awarded under an umbrella agreement, referred to as the Special Middle East Sealift Agreement (SMESA). The agreement set the general terms under which transportation services would be provided, although no carrier was guaranteed any particular amount of cargo. The agreement allowed MSC to select the carrier for each shipment based on factors such as sailing dates, travel times, and vessel capacities.

Tariff 536 is one of Sea–Land's commercial tariffs. It covers the ocean transportation of commercial cargo between the same points and ports in the Continental United States and the Middle East as SMESA. Tariff 536 was on file with the Federal Maritime Commission and was in effect throughout the period that MSC was shipping goods under SMESA.

The SMESA agreement divided all cargo into three categories: vehicles, refrigerated goods, and cargo not otherwise specified (Cargo N.O.S.). Only Cargo N.O.S. is at issue in this case. Under SMESA, certain explosives and other hazardous materials could be shipped as Cargo N.O.S. as long as they were not required to be transported on deck. Tariff 536 also contained a rate for Cargo N.O.S. The Tariff 536 Cargo N.O.S. rate, however, specifically excluded explosives and other hazardous materials.

Following the expiration of the SMESA agreement, an MSC contract specialist compared SMESA's Cargo N.O.S. rates with those of Sea–Land's Tariff 536 for inbound cargo shipped back from the Middle East. The contract specialist determined that Sea–Land's port-to-port rates under SMESA were significantly higher than its port-to-port rates under Tariff 536. Based on that determination, MSC made a claim against Sea–Land for an overpayment of more than $18 million. Sea–Land contested MSC's claim by appealing to the Armed Services Board of Contract Appeals.

The Board upheld MSC's claim on the ground that the McCumber Amendment prohibited Sea–Land from charging higher rates for the port-to-port component of its transportation services than it charged pri-

**1378**

vate shippers for port-to-port transportation of like goods under Tariff 536. In ruling in favor of MSC, the Board first rejected Sea–Land's argument that the McCumber Amendment does not create a right to recover for overcharges, but is simply a condition that must be satisfied in order for domestic carriers to enjoy the statutory preference established by the Cargo Preference Act. The Board then rejected Sea–Land's argument that differences between the service provided under SMESA and the service provided under Tariff 536 justified the differences in rates. The Board ruled that the McCumber Amendment prohibits different charges for the transportation of like goods, but contains no exception for differences in the service offered in connection with the transportation. Finally, although the Board noted that the kinds of goods that could be shipped as Cargo N.O.S. under Tariff 536 differed in some respects from the kinds of goods that could be shipped as Cargo N.O.S. under SMESA, it concluded that the differences did not affect Sea–Land's liability in this case, because Sea–Land had failed to show that MSC actually shipped any goods as Cargo N.O.S. under SMESA that would not have qualified as Cargo N.O.S. under Tariff 536.

### III

■ At the outset, the government challenges our jurisdiction over this appeal. The Contract Disputes Act authorizes this court to review decisions of the boards of contract appeals. *See* 41 U.S.C. § 607(g)(1). Excepted from that grant of jurisdiction, however, are appeals "arising out of maritime contracts." 41 U.S.C. § 603.

■ The provision of the Contract Disputes Act barring this court from hearing appeals concerning maritime contracts is based on the traditional exclusive jurisdiction of United States district courts over admiralty cases. *See Southwest Marine, Inc. v. United States*, 896 F.2d 532, 534 (Fed.Cir.1990). Thus, the reference in

the Contract Disputes Act to disputes "arising out of maritime contracts" incorporates the law regarding the scope of admiralty jurisdiction, which provides that admiralty extends only to contracts that are "wholly maritime" in nature. *See Dalton v. Southwest Marine, Inc.*, 120 F.3d 1249, 1250 (Fed.Cir.1997); *Alaska Barge & Transp., Inc. v. United States*, 179 Ct.Cl. 216, 373 F.2d 967, 970 (1967). That general rule, however, is subject to two exceptions: an admiralty court will retain jurisdiction over a contract that is not wholly maritime in nature if (1) the non-maritime feature of the contract is merely incidental, or (2) "the non-maritime feature of the contract is separable from the maritime elements, so that it may be severed and litigated independently without prejudice to any party." *Alaska Barge*, 373 F.2d at 970.

Under the terms of SMESA, Sea–Land was required to offer both port-to-port and "through intermodal" transportation, *i.e.*, integrated transportation of goods over both sea and land. Nearly all of the more than 5000 transportation orders that are at issue in this case were for through intermodal transportation rather than port-to-port transportation. Thus, the vast bulk of the shipping orders were not "wholly maritime" in nature. Moreover, the land transportation component of many of those transportation orders was considerable, involving substantial transportation between inland locations and ports both in this country and in the Middle East. The land transportation component of the SMESA shipments thus cannot be regarded as merely "incidental" to the maritime component. *See Alaska Barge*, 373 F.2d at 971; *Kuehne & Nagel (AG & Co.) v. Geosource, Inc.*, 874 F.2d 283, 290 (5th Cir. 1989). The jurisdictional question in this case therefore turns on whether the second exception to the general rule set forth above is applicable, *i.e.*, whether the maritime aspects of the contracts are readily severable from the non-maritime aspects or, as Judge Learned Hand put it, whether

"the maritime obligations can be separately enforced without prejudice to the rest." *Compagnie Francaise De Navigation a Vapeur v. Bonnasse,* 19 F.2d 777, 779 (2d Cir.1927). If that exception applies, this court lacks jurisdiction over this appeal.

In *Alaska Barge,* the Court of Claims held that the land transportation components of the contracts at issue were not severable from the ocean transportation components, and the court therefore declined to transfer the case to a district court sitting in admiralty. The government correctly notes that *Alaska Barge* is distinguishable from this case, because in that case the maritime and land components of the transportation contract were not separately itemized, whereas under SMESA they were. The fact that the rates for the inland and ocean components of the transportation were set out separately, however, does not mean that the ocean portions of the transportation orders must necessarily be severable for jurisdictional purposes. To the contrary, one of Sea–Land's arguments on the merits is that its rates for the inland portion of the transportation ordered under SMESA cannot be considered separately from the rates for the ocean portion of the transportation. That is, Sea–Land argues that in determining whether it charged MSC more than it charged private shippers for ocean carriage, the Board should not have compared Sea–Land's tariff rates for ocean shipping with its rates for the ocean component of the intermodal transportation it offered under SMESA.

In order for us to conclude that the ocean component of Sea–Land's through intermodal service is severable from the inland component for purposes of determining jurisdiction, we would have to reject one of Sea–Land's principal arguments on the merits—that for purposes of testing compliance with the McCumber Amendment it is not proper to separate the ocean component of Sea–Land's intermodal service from the inland component of that service and compare it to the sim-

ple port-to-port service offered under Tariff 536. Thus, to conclude for jurisdictional purposes that the non-maritime features of the contract may be separated from the maritime elements would be to pre-judge one of Sea–Land's principal arguments on the merits, a result that would be prejudicial to Sea–Land's litigating position on the merits of its defense to the government's claim. This is therefore not a case in which the maritime portions of the contract can be severed from the non-maritime obligations "and litigated independently without prejudice to any party." *Alaska Barge,* 373 F.2d at 970–71. Instead, it is one in which "the question of jurisdiction is dependent on decision of the merits," *Land v. Dollar,* 330 U.S. 731, 735, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), and thus one in which the court may exercise jurisdiction and decide the merits of the case. *See Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 213 n. 10, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) (Marshall, J. concurring). For that reason, we hold that we have jurisdiction over this appeal under the Contract Disputes Act.

### IV

█ On the merits, Sea–Land first renews its argument that even if the rates it charged MSC for port-to-port service were in excess of those available to private shippers, the McCumber Amendment does not give MSC the right to recover the overcharge. According to Sea–Land, the McCumber Amendment does not establish a cause of action for monetary relief, but is simply a prerequisite that U.S. carriers must satisfy in order to qualify for the statutory preference granted by the Cargo Preference Act. The Board rejected that argument, and so do we.

The Cargo Preference Act contains two limitations. The first is clearly a condition on the availability of the statutory preference: it provides that the preference will be denied to domestic carriers if the President finds that domestic carriers are imposing "excessive or unreasonable" ship-

ping charges. The second, the McCumber Amendment, is phrased differently; it flatly prohibits carriers from charging more for transporting goods for the military than for private persons. The difference in the language of the two limitations suggests that they operate in different ways and that the second, unlike the first, imposes an affirmative legal bar to discriminatory rates rather than simply creating a condition on the receipt of a benefit.

In any event, Sea–Land's argument that the McCumber Amendment does not give rise to a cause of action for overpayments is contrary to the terms of the contract between the parties. The SMESA solicitation expressly provided that the "Cargo Preference Act of 1904 has the effect of establishing a ceiling price," and it required each offeror to certify that "the ocean and inland rates offered to the Government do not exceed [offeror's] charges for transporting like goods for private persons." Thus, regardless of whether the McCumber Amendment, standing alone, gives rise to a cause of action for restitution, the language of SMESA makes a violation of the McCumber Amendment a breach of contract for which the government is entitled to conventional remedies, including an action for recovery of the overpayment.

## V

■ Sea–Land next points out that the SMESA agreement was filed as a tariff with the Federal Maritime Commission. Based on that fact, Sea–Land argues that the "filed rate doctrine" abrogates MSC's right to obtain monetary relief as a result of any charges imposed in violation of the McCumber Amendment. When applicable, the filed rate doctrine prohibits a carrier from providing services at any rate other than the rate on file with the regulatory agency that supervises that carrier. *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 126, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). Under the doctrine, which was designed to prevent discrimination in transportation charges, the filed rate is the governing rate, and equitable defenses to collection of the filed rate are not permitted as long as the administrative authority has not held the rate to be unreasonable. *See Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915). The filed rate doctrine, however, does not immunize a tariff from challenge if the tariff is contrary to a statutory prohibition. *See Reiter v. Cooper,* 507 U.S. 258, 266, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). In this case, the McCumber Amendment prohibits Sea–Land from charging MSC more than it would charge private persons for transporting the same goods. It is irrelevant to analysis under the McCumber Amendment whether the charges were imposed pursuant to a filed tariff; if the filed tariff is at odds with the McCumber Amendment, it is unlawful and may not be imposed.

## VI

■ Sea–Land next argues that if the SMESA agreement did not comply with the McCumber Amendment, the agreement was illegal and thus voidable. In that event, Sea–Land asserts, the only remedy available to MSC was to cancel the contract or stop using it. As MSC never availed itself of either of those remedies, Sea–Land contends that the SMESA rates were binding on MSC. On the other hand, Sea–Land argues that if the illegality was plain on the face of the contract, then the contract is *void ab initio.* Under this scenario, MSC would be required to pay the published intermodal service rates under Tariff 536 for the through intermodal services that it used.

According to Sea–Land, the Board in essence held that SMESA was *void ab initio* because MSC lacked authority under the McCumber Amendment to contract for SMESA rates. What the Board then did was to refund the difference between the port-to-port rates under Tariff 536 and SMESA to create a new tariff for

the intermodal transportation provided by Sea–Land—a tariff that was never available to any commercial shipper for through intermodal transportation.

The contract was neither void nor voidable. The McCumber Amendment (and the provision of the contract incorporating the McCumber Amendment by reference) simply had the effect of imposing a limitation on the rates that could be charged under the contract under certain circumstances. The McCumber Amendment was part of the background against which the contract was formed, and the parties expressly incorporated its terms into their agreement. While Sea–Land does not agree with the way the Board construed the McCumber Amendment, the construction of the statute (and the construction of the corresponding term of the contract) in a manner that is not to Sea–Land's liking does not render the contract void or voidable.

## VII

We now turn to the question at the heart of this appeal—whether Sea–Land overcharged MSC for transportation services under SMESA. The Board held that Sea–Land violated the McCumber Amendment because it charged MSC more for the ocean component of its shipping services than it charged private shippers for port-to-port shipping of similar goods. The Board compared Sea–Land's port-to-port rate under SMESA to the port-to-port rate available under Tariff 536 and concluded that Sea–Land's rates under SMESA were higher than its rates to private parties for shipping like goods.

On appeal, Sea–Land argues that it did not violate the McCumber Amendment, for two basic reasons. First, Sea–Land contends that the service it provided under SMESA was different from the service it provided under Tariff 536. Second, Sea–Land contends that the nature of the goods it agreed to transport under SMESA was different from the nature of the goods covered by Tariff 536. The Board rejected both arguments. As to the first,

the Board held that differences in service are irrelevant to analysis under the McCumber Amendment, which refers only to "like goods" and makes no reference to "like service." As to the second, the Board concluded that Sea–Land failed to prove that the goods it actually transported under SMESA would not have been eligible for transportation under Tariff 536. For that reason, the Board concluded, Sea–Land failed to show that the difference in the cost of its port-to-port service under SMESA and under Tariff 536 was justified by a difference in the nature of the goods transported. On appeal, Sea–Land renews both of the arguments that the Board rejected.

## A

With respect to Sea–Land's argument that the differences in its shipping rates under SMESA and Tariff 536 were justified by differences in the nature of the service Sea–Land was required to provide under the two schedules, the Board's analysis was essentially as follows: the McCumber Amendment prohibits carriers from imposing different charges for transporting "like goods"; the statute contains no reference to "like service"; differences in service therefore cannot justify differences in shipping rates for purposes of avoiding the prohibition of the statute.

We do not read the McCumber Amendment so narrowly. The legislative history indicates that the statute was intended to prohibit price discrimination against military shippers, *i.e.*, "to confine transportation charges to an equality with individuals." H.R.Rep. No. 58–1893, Part 3, at 1–2 (1904). And in an opinion issued shortly after the enactment of the McCumber Amendment, the Attorney General characterized the statute as a bar to price discrimination against the government. *See* 26 Op. Att'y Gen. 415, 420 (1907) ("the vessels claiming [the statutory preference] must not discriminate against the Government in their charges, as these are com-

pared with the rates of freight established for private shippers").

In order to determine whether prices are discriminatory, it is essential to assess the nature of the service provided for the price in question. As the Supreme Court has explained, rates

> do not exist in isolation. They have meaning only when one knows the service to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa.... An unreasonable discrimination in charges ... can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price.

*American Tel. & Tel. Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 223, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) (quotations omitted).

The concept that price discrimination incorporates the element of equal services for the same price has been part of the law of price discrimination since at least the enactment of the Interstate Commerce Act, only a few years before the enactment of the Cargo Preference Act of 1904. As the Supreme Court explained at the time, one of the objectives of acts regulating common carriers, such as the Interstate Commerce Act, was "to prohibit unjust discriminations in the rendition of like services under similar circumstances and conditions." *Interstate Commerce Comm'n v. Baltimore & Oregon R.R.*, 145 U.S. 263, 276, 12 S.Ct. 844, 36 L.Ed. 699 (1892). Absent a clear indication to the contrary in the statute, we therefore conclude that the prohibition against price discrimination that was the policy underlying the McCumber Amendment was meant to incorporate the requirement that pricing comparisons be made for equal services as well as for like goods.

## 1

The government defends the Board's construction of the McCumber Amendment, pointing out that the statute makes an explicit reference to "like goods," but makes no such reference to "like services." The statute, however, prohibits differences in "charges made for the transportation of [military] supplies" and "charges made for transporting like goods for private persons." Those terms clearly require that the service provided be similar in at least some respects in order to trigger the statutory prohibition. At the most basic level, for example, the charges must be for transportation between the same two locations in order for the statute to apply. Similarly, the government appears to acknowledge that the McCumber Amendment does not prohibit different charges for transportation services that differ at least in important respects, such as the provision of loading and unloading or other port services. The term "charges" in the McCumber Amendment therefore must be interpreted to refer to the rates charged for transportation service having certain common features. The logical extension of that analysis is that when the features of the transportation service provided for the military differ materially from the features of the transportation service provided to private parties between the same two locations, a difference in the rates for the two services cannot be regarded as a difference in the charges for the same transportation of the same goods within the meaning of the McCumber Amendment. We therefore disagree with the Board's conclusion that differences in service are immaterial to a finding of liability for charging different rates for transporting like goods between the same two locations.

## 2

■ While we agree with Sea–Land that the McCumber Amendment must be construed to take into account material differences in services offered for different shipping rates, we do not agree with Sea–Land's broader argument that it was improper for the Board to compare the port-to-port component of the through intermo-

dal service that it offered under SMESA with the port-to-port service that it offered to private parties under Tariff 536. Sea–Land argues that to permit MSC to compare the rates for one component of its through intermodal service with the rates for port-to-port service, rather than comparing the rates for intermodal service as a whole with the rates for intermodal service under Tariff 536, constitutes "cherry-picking" and would result in MSC obtaining a rate for intermodal service that is lower than the intermodal rate offered to any other party. The answer to that contention is that in its SMESA solicitation, MSC insisted on "combination" or "multifactor" rates consisting of segregable, individually priced components representing a port-to-port factor and an inland factor. MSC further required offerors to certify that the "ocean and inland rates offered to the Government" did not exceed the charges for transporting like goods for private persons. Because the contract required Sea–Land to itemize the components of its through intermodal service for the purpose of McCumber Amendment analysis, it was proper for MSC to compare the rates that Sea–Land bid for the port-to-port component of its service with the rates for port-to-port service under Tariff 536. Put another way, absent material differences in the nature of the service provided, the contract required Sea–Land to offer the same rate for the ocean component of its through intermodal service as it offered for port-to-port service under its tariff.

### 3

■ The government argues that Sea–Land cannot prevail even if it is correct that differences in service can justify differences in rates under the McCumber Amendment, because the Board found that there were no material differences in the port-to-port service provided to MSC under SMESA and to private shippers under Tariff 536. The Board found that throughout the period that SMESA was in effect, Sea–Land carried commercial container cargoes alongside military cargoes on routes that were subject to SMESA and that Sea–Land accorded no different treatment as between commercial and military containers. In addition, the Board pointed to a provision that was incorporated into the SMESA solicitation, which provided that "services offered to the government . . . which are not offered to commercial shippers will not be considered."

The Board's findings as to the similarity of the service that Sea–Land provided for commercial and military cargo suggest that Sea–Land may not be able to avoid a McCumber Amendment violation on the basis of differences between the port-to-port component of its service under SMESA and the port-to-port service it offered to commercial shippers under Tariff 536. Nonetheless, because the Board regarded the issue of differences in service as irrelevant to a McCumber Amendment violation, it was not necessary for the Board to rest its decision on the absence of any differences in the service provided to military and private shippers. We are unsure whether the Board intended its remarks about the absence of differences in service to constitute an alternative ground for its ruling. If so, the Board on remand can elaborate on its findings on that issue and make clear that it would reach the same conclusion, even in light of our legal ruling that differences in service may affect analysis under the McCumber Amendment. If not, the Board can address that issue anew and determine whether there were any material differences in the service offered to military and private shippers that would provide a basis for holding the McCumber Amendment inapplicable to the shipments at issue in this case. A "material difference" for these purposes is one that is more than trivial, *i.e.,* one that could have some commercial significance.

### B

■ Finally, Sea–Land argues that the McCumber Amendment was not violated

in this case because the goods that could be shipped as Cargo N.O.S. under SMESA differed from the goods that could be shipped as Cargo N.O.S. under Tariff 536. For that reason, Sea–Land argues, the respective Cargo N.O.S. rates for military and private transportation did not pertain to "like goods." The Board acknowledged that certain kinds of explosives and hazardous cargo could be shipped as Cargo N.O.S. under SMESA, but not under Tariff 536. The Board found, however, that Sea–Land had failed to offer satisfactory evidence that MSC had shipped explosive, hazardous, or dangerous cargo in any of the shipments at issue in this case. Therefore, the Board concluded, the higher rate for shipping Cargo N.O.S. under SMESA could not be justified by a difference in the nature of the cargo actually transported under that category.

The Board's analysis focused on what MSC actually shipped under SMESA rather than what it had a contractual right to ship. In that respect, the Board focused on the wrong question. The proper question is what MSC could have shipped under the SMESA Cargo N.O.S. rate, not what it did in fact ship. The SMESA rates were negotiated before any cargo was shipped, and MSC negotiated for the right to ship certain cargo as Cargo N.O.S. without making special arrangements with the carrier or paying an additional fee. Sea–Land had no way of knowing before contract performance what percentage of the shipments would contain supplies such as explosives. It therefore cannot be held liable for pricing its contract according to the kinds of goods it agreed to carry, rather than the kinds of goods that that MSC actually shipped. Accordingly, the Board should have determined whether MSC had the right to ship goods under SMESA as Cargo N.O.S. that it would not have been permitted to ship as Cargo N.O.S. under Tariff 536.

Because the Board focused principally on the fact that Sea–Land failed to prove that MSC actually shipped any cargo as Cargo N.O.S. that could not have been shipped as Cargo N.O.S. under Tariff 536, the Board did not make detailed findings with respect to the differences between the goods that MSC had a right to ship as Cargo N.O.S. under SMESA and the goods that private shippers could have shipped as Cargo N.O.S. under Tariff 536. Nor did the Board make any findings as to the rate that a private shipper would have had to pay Sea–Land for the right to ship goods of the sort described in the SMESA Cargo N.O.S. category. There may be other factual questions that bear on whether there are any material differences between the kinds of goods that Sea–Land was legally obligated to carry as Cargo N.O.S. and the kinds of goods that it carried as Cargo N.O.S. under Tariff 536. The Board is the proper tribunal to make those factual determinations and we therefore remand the case to the Board for further proceedings consistent with the legal conclusions discussed above.

Each party shall bear its own costs for this appeal.

*VACATED and REMANDED.*