TRANSCONTINENTAL BUS SYSTEM, INC., et al., Trailways of New England, Inc., Capitol Bus Company, Inc., et al., Virginia Stage Lines, Inc., et al., Continental Tennessee Lines, et al., Deluxe Trailways, Inc., et al., American Buslines, Inc., et al., Continental Pacific Lines, et al., D. C. S. P. Motor Way, Inc., et al., Adirondack Transit Lines, Inc., et al.; National Trailways Bus System, Petitioners,

v.

CIVIL AERONAUTICS BOARD, Respondent.

TRANSCONTINENTAL BUS SYSTEM, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD, Respondent (two cases).

Nos. 22791, 23020–23027, 23054, 23099, 23512, 23513, 23410, and 23411.

United States Court of Appeals Fifth Circuit.

July 24, 1967.

Theodore Hardeen, Jr., Charlottesville, Va., Howard S. Boros, Washington, D. C., Warren A. Goff, Dallas, Tex., for petitioners.

O. D. Ozment, Assoc. Gen. Counsel, Joseph B. Goldman, Gen. Counsel, Warren L. Scharfman, Assoc. Gen. Counsel, Robert L. Toomey, Acting Assoc. Gen. Counsel, John H. Wanner, Gen. Counsel, Civil Aeronautics Bd., Washington, D. C., Howard E. Shapiro, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before GEWIN, THORNBERRY and DYER, Circuit Judges.

GEWIN, Circuit Judge:

These are consolidated petitions for review of several orders of the Civil Aeronautics Board (Board) dismissing without a hearing the petitioners' consolidated complaints which sought the suspension and investigation of tariffs filed by numerous air carriers providing for reduced rates for military standby, youth standby, and young adult passengers. The petitioners, forty-six independent motor carriers licensed by the Interstate Commerce Commission and a national trade association of motor bus operators, claimed that the tariffs were unreasonable, uneconomic, and unjustly discriminatory in violation of sections 403(b) and 404(b) of the Federal Aviation Act of 1958, 49 U.S.C. §§ 1373(b) and 1374(b) (1964). The Board found that the complaints failed to set forth sufficient facts to warrant suspension or investigation of the tariffs and, in accordance with § 1002 of the Act, 49 U.S.C. § 1482 (1964), dismissed the complaints without a hearing.

The petitioners sought review of the orders approving the military standby tariffs in the eleven Courts of Appeals. The petitions were transferred to this Court and consolidated with the petition filed in this Court, Case No. 22,791. Subsequently, the petitioners sought review of the orders approving the youth and young adult fares in this Court, and those petitions, Nos. 23,410 and 23,411, were also consolidated with Case No. 22,791 in this proceeding. We affirm the action of the Board with respect to the military standby tariff, but set aside the orders relating to the youth and young adult tariffs and remand for further proceedings.

The military standby tariff provides that military personnel traveling in uniform on leave, pass, or furlough or within seven days of discharge may fly on a standby basis for approximately one-half of the regular jet coach fare.[1] The standby status permits the traveler to be accommodated only if seats are available after all regular fare passengers have been boarded and subjects him to being deplaned enroute or "bumped" to accommodate a regular fare passenger.[2]

The youth standby tariff similarly allows a rate reduction of fifty percent of the regular jet coach rate and provides carriage only after all regular fare and military standby passengers have been accommodated. Persons traveling under this tariff may also be "bumped" enroute. The reduced rates are available only to youths over the age of 12[3] and

---

1. In the case of local service carriers which offer only one class of service, the fare is one-half of the regular fare charged for that service, i. e. 50% of first class propeller service.

 The tariff also provides that when traveling on a permanent change of station 66 pounds of baggage is permitted without a charge for over-weight as compared with 40 pounds for the regular first class passenger.

2. The military standby tariff of Frontier Airlines, Inc. provides for transportation without the "bumping" limitation. Military personnel traveling subject to this tariff are guaranteed straight passage to their ticketed destination once enplaned.

3. Children under the age of 2 years travel free and children between the ages of 2 and 12 travel at half fare if accompanied by an adult. A child between the ages of

under the age of 22 who purchase an identification card issued annually by the airlines for the sum of $3.00. The reduced fares are unavailable during certain peak holiday periods, namely Easter, Thanksgiving, Christmas and New Years.[4]

The young adult fare tariff, proposed only by Allegheny Airlines, Inc.[5] is also applicable only to persons between the ages of 12 and 22 who hold identification cards issued annually by the airline for the sum of $10.00. Cards procured after June 30, however, may be purchased for $5.00. This tariff provides for the making of reservations and the rates are two-thirds of the regular first class fare.

To more fully understand the nature of these proceedings a short history of reduced fares for military personnel and youths is required. The Board first sanctioned reduced fares for military personnel traveling at their own expense in 1956. Those tariffs provided for reduced fares on flights between the continental United States and the then territories of Alaska and Hawaii. These rates were authorized under Board regulations issued pursuant to the provision of § 403(b) which excises overseas and foreign tariffs from the strictures of that section and relegates control of such traffic to the Board. When the territories became states, however, travel between them and the continental United States was no longer overseas transportation and the rates were abandoned. The present military standby tariffs here under consideration were first submitted in essentially their present form and were authorized by the Board on a tem-

porary basis in 1963. See American Airlines Military Fares, 38 C.A.B. 1038 (1963). Those tariffs provided for a fifty percent reduction in jet coach rates and applied to military personnel traveling in uniform on furlough, leave, or pass. Carriage under the tariff was on a standby basis, and passengers were to be accommodated only in empty coach seats. The expiration dates for those tariffs were set in early 1965. Subsequent extensions expanded the service to its present state. The complaints of the petitioners in the instant proceeding were directed at tariffs filed by twenty air carriers proposing an indefinite extension of the military standby tariff.

Reduced rates for youths under twelve have traditionally been a part of the rate scheme in the transportation industry. In 1961 the Board first approved reduced fares [6] for youths between the ages of 12 and 22 as a promotional experiment. Those tariffs provided for a fifty percent reduction in fare and permitted the making of reservations within three hours of flight time. Shortly after the tariffs went into effect they were abandoned by the trunkline air carriers because of operating difficulties caused by the tariffs. Several local service carriers, however, continued the reduced rates, and they are still in effect today.[7] In December 1965, American Airlines, Inc. filed the youth standby tariff here in question. On the same day, Allegheny Airlines filed its young adult tariff. Neither tariff contained an expiration date. Complaints were filed against the youth tariff of American by five com-

---

2 and 12 traveling without an accompanying adult must pay the full regular fare. See Full Fare For Unaccompanied Children, 24 C.A.B. 408 (1956).

4. The exact dates on which the reduced rates are unavailable varies with the individual air carrier involved. See Appendix B, C.A.B. Press Release, Jan. 20, 1967.

5. A substantially similar tariff filed by Delta Air Lines, Inc. was approved by the Board on May 9, 1966. See Order

No. E-23656. The propriety of that order, however, is not before us.

6. Youth Fares Proposed by Domestic Carriers, Order No. E-17367, Aug. 25, 1961.

7. Youth fares are in effect on Bonanza, Central, Frontier, Ozark, Pacific, Southern, Trans-Texas and West Coast Airlines. Since 1963, Frontier and Southern have permitted the making of reservations by youths traveling at the reduced rate.

peting airlines,[8] the American Society of Travel Agents, and the petitioners. Only the petitioners filed a complaint against Allegheny's young adult tariff. The complaints in both cases sought suspension and investigation of the tariffs. The Board in dismissing the complaints limited its approval to an experimental one year period.[9] It also required the carriers to file quarterly reports containing statistical data and evaluations of the effectiveness of the tariffs.

The petitioners alleged before the Board and assert here on review that the tariffs are unreasonable and unjustly discriminatory in violation of the Federal Aviation Act of 1958 (FAA). They contend that the tariffs are unreasonable and uneconomic because they are not reasonably related to the fully allocated cost of transportation. They also contend that Allegheny's young adult tariff is unreasonable because there is no cost savings to the air carrier which would justify the reduced fare. They further allege that the young adult tariff is incapable of generating enough additional traffic to overcome the diversion from normal regular fare traffic and that the tariff is therefore not justified under the profit-impact test advanced by the Board.

The petitioners also assert that the fares are unjustly discriminatory because they are based solely on the identity of the traffic, which is "like" all other passenger traffic, and that the factors upon which the Board granted relief in approving the tariff were beyond the scope of its competence because such factors did not relate to carriage. It is alleged that the standby features of the military and youth tariffs do not differentiate the service from regular service in view of the low average load factors on most domestic flights; it is also pointed out that the reservation feature of the young adult tariff eliminates even that minor difference. In addition, the petitioners contend that the identification card requirement of the youth and young adult tariffs do not distinguish the service or serve as a valid distinction as compared with other promotional fares. Thus, the petitioners conclude, the tariffs offer like service to like traffic under the same or similar circumstances at a reduced rate and are therefore unjustly discriminatory in violation of § 404(b) of the FAA.

In dismissing the complaints, the Board ruled that the standby provisions of the military and youth tariffs sufficiently distinguished the service from that offered regular fare passengers, that the fare was not based solely on the identity of the traffic but was justified, in the case of the military standby tariff, by the national defense considerations advanced by the Secretary of the Army, and, in the case of the youth fares, by the traditional discounts offered youths by the transportation industry and the promotional effects of the tariff. The Board further found that the tariffs fostered the financial position of the industry by increasing revenue, improving the utilization of equipment and

---

8. The airlines filing complaints were Delta Air Lines, Inc., Northwest Airlines, Inc., Trans World Airlines, Inc., United Air Lines, Inc., and Western Air Lines, Inc. Subsequent to the filing by American Airlines, similar youth fares were filed as defensive tariffs by Braniff Airways, Inc., Continental Air Lines, Inc., Delta Air Lines, Inc., Eastern Air Lines, Inc., Trans World Airlines, Inc., and United Air Lines, Inc. No review of the Board's order dismissing their complaints without a hearing was sought by the complaining airlines.

Delta subsequently filed a tariff similar to Allegheny's young adult fare. See note 5 supra.

9. The Board subsequently granted the unlimited extensions requested by five carriers: American, Northeast, United, Western, and Pan American Airlines, Inc. Pan American's reduced fare tariff applied only to flights between the west coast and Hawaii. One year extensions were requested by and granted to Braniff, Continental, Delta, Eastern, National, Northwest and Trans World Airlines. C.A.B. Press Release, Jan. 20, 1967. The propriety of those orders are not before us.

ground facilities, and filling seats which otherwise would be vacant. With respect to the young adult fares, the Board again noted the industry tradition of granting discounts to youths, the promotional aspects of the tariff, the potential for greater utilization of air transportation by a significant segment of the population not now using air transportation, and the impecunious state of those eligible under the tariff. It also observed that authorizing the tariffs on a one year experimental basis conformed generally with the policy of allowing airline management to exercise its discretion more freely to improve air transportation and increase air carrier traffic.

### I.

At the outset we are presented with an argument which basically questions the standing of the petitioners to challenge the tariffs in issue, although the government contends that we do not actually have to reach the question of whether the petitioners have standing in order to dispose of the case.[10] Essentially, the Board asserts that the petitioners have not shown that the action of the Board in approving the tariffs here in question subjects those persons whose interest the relevant portions of the FAA were designed to protect to any substantial harm, and therefore, they can not object to the action of the Board. It argues that §§ 403(b) and 404(b) were intended to protect airline passengers, shippers, and communities served by air carriers from unjust discrimination, and undue and unreasonable preference or prejudice. The mere adverse economic impact of the approved tariffs on the petitioners, competitors of the air carriers, is an insufficient harm to warrant an investigation of suspension of rates.[11] Indeed, the Board asserts that it need not even specifically consider the effect of a proposed rate on surface transportation in determining whether a proposed tariff satisfies the requirements of the sections in question. Since the petitioners have not shown that the orders sought to be reviewed have harmed those protected by the Act, they can not complain of the action of the Board in approving the tariffs. In summary, the Board concludes that it is somewhat anomalous to allow the petitioners to object to tariffs which have widespread support in the air transportation industry and which have not been objected to by those not eligible to travel at the reduced rates offered under the tariffs.

In Flying Tiger Line, Inc. v. CAB, 121 U.S.App.D.C. 332, 350 F.2d 462 (1965) the Court was presented with

---

10. On oral argument, counsel for the Board conceded, in effect, that under recent court decisions the petitioners have standing to prosecute this petition for review. Notwithstanding this concession, the Board maintains both in its brief and during oral argument that the petitioners have not assigned proper or sufficient reasons for their attack on the orders. In essence, the Board argues that even if the petitioners have standing, they have not set forth sufficient or adequate reasons to warrant judicial review of the action of the Board. We therefore deem it appropriate, and perhaps necessary, to deal with the question.

11. The government insists that the decision whether or not to suspend a tariff is a matter committed to agency discretion and is not subject to judicial review. See § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 1009(e)

(1964); Arrow Transp. Co. v. Southern R. R., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963). Because of the manner in which we dispose of the case, we find it unnecessary to pass on the question of whether we can review a Board decision suspending or not suspending a tariff.

For a general discussion of when judicial review may be obtained where action is committed by law to agency discretion, see Berger, Administrative Arbitrariness and Judicial Review, 65 Colum.L.Rev. 55 (1965); responded to in 4 Davis, Administrative Law Treatise § 28.16 (Supp.1966), followed by a rejoinder, surrejoinder, rebutter and surrebutter in Administrative Arbitrariness, 114 U. of Pa.L.Rev. 783, 814, 816, 832 (1966). See also Jaffee, Judicial Control of Administrative Action 181–82, 375 (1966).

substantially the same issue as the one before us, albeit in a different factual background. There, Pan American World Airways, Inc. had filed a tariff which provided for the overseas carriage of military stores and impedimenta traveling under United States Government bills of lading for the Defense Department.[12] Flying Tiger, a competing air carrier, filed a complaint charging that the rates were unjustly discriminatory as a matter of law in violation of § 404(b) in that they were dependent on the status of the shipper, i. e. the tariffs provided for preferential treatment of one shipper, the Federal Government. The Board dismissed the complaint without a hearing. In affirming the Board, the Court concluded that no abuse of discretion had been shown as the complaint did not make out a plausible case that the order would subject shippers, or other carriers to any substantial harm. 350 F.2d at 465.[13] The Court held that the assertion by Flying Tiger that it was a "sometime shipper of freight over the routes covered by the tariff" did not satisfy the requirement that harm to shippers be demonstrated. It observed that the record did not disclose what, aside from its own equipment, Flying Tiger shipped. The government urges us to reach a similar conclusion and thusly avoid reaching the issue of whether the petitioners have standing.

■ Sections 403(b) and 404(b) [14] provided in general terms, that airline

---

12. The petitioners distinguish *Flying Tiger* on the ground that it involved overseas and foreign transportation. As such the Board's discretion in approving any proposed tariff is substantially greater as such tariffs are controlled by Board regulations issued pursuant to § 403(b). While there is some plausibility to this interpretation of the decision, we do not choose to follow that interpretation. The opinion indicates that the proposed tariff applied mainly, not only, to overseas transportation by air, and the decision itself does not depend on any vagaries attributable to overseas or foreign transportation.

13. By disposing of the case in the manner in which it did, the Court did not reach the standing question. 350 F.2d at 465.

14. Sections 403 and 404 provide, in pertinent part, as follows:

Filing of Tariffs Required

"Sec. 403(a). Every air carrier and every foreign air carrier shall file with the Board, and print, and keep open to public inspection, tariffs showing all rates, fares, and charges for air transportation between points served by it, and between points served by it and points served by any other air carrier or foreign air carrier when through service and through rates shall have been established, and showing to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation."

Observance of Tariffs; Rebating Prohibited

"(b) No air carrier or foreign air carrier shall charge or demand or collect or receive a greater or less or different compensation for air transportation, or for any service in connection therewith, than the rates, fares, and charges specified in its currently effective tariffs; and no air carrier or foreign air carrier shall, in any manner or by any device, directly or indirectly, or through any agent or broker, or otherwise, refund or remit any portion of the rates, fares, or charges so specified, or extended to any person any privileges or facilities, with respect to matters required by the Board to be specified in such tariffs, except those specified therein. Nothing in this Act shall prohibit such air carriers or foreign air carrier, under such terms and conditions as the Board may prescribe from issuing or interchanging tickets or passes for free or reduced-rate transportation to ` their directors, officers, and employees (including retired directors, officers, and employees who are receiving retirement benefits from any air carrier or foreign air carrier), the parents and immediate families of such officers and employees, and the immediate families of such directors, widows, widowers, and minor children of employees who have died as a direct result of personal injury sustained while in the performance of duty in the service of such air carrier or foreign air carrier; witnesses and attorneys attending any legal investigation in which any such air carrier is interested; persons injured in aircraft accidents and physicians and nurses attending such persons; immediate families, including parents, of persons injured or killed in aircraft accidents where the object is to transport such persons in connection with such accident; and any person or property with

traffic, both passenger and cargo traffic, is to be treated equally by the air carriers. The sections are designed to insure that rates and services are offered on an equal basis to all who seek to use the air carriers. They were intended to protect the traveling public and were designed to effectuate the "rule of equality" in the air transportation industry.

▇ The granting of preferential and discriminatory rates in an indiscriminate manner was one of the abuses, among others, which gave rise to the passage of the Interstate Commerce Commission Act, New York, N. H. & H. R. Co. v. Interstate Commerce Commission, 200 U.S. 361, 391–392, 26 S.Ct. 272, 50 L.Ed. 515, 521 (1906); Lichten v. Eastern Airlines, Inc., 189 F.2d 939, 941, 25 A.L.R.2d 1337 (2 Cir. 1951), and both that Act and the Civil Aeronautics Act of 1938, as re-enacted in the Federal Aviation Act of 1958, were enacted to halt those abuses. The Civil Aeronautics Board is charged under §§ 102 and 1002 of the Act with, inter alia, enforcing the provisions of §§ 403(b) and 404(b) to protect the public interest. Failure on the part of the Board to implement and enforce these provisions, of the Act, insofar as they relate to the transportation of passenger traffic, necessarily results in the preference of one class or group of passengers to the prejudice of another. As such, a harm to the traveling public results. The petitioners in seeking review of the action of the Board in approving the tariffs here in question, are acting in the interest of the public, and for the protection of a public right.

Although it was early held that a litigant could assert only his own rights, and was barred from asserting the rights of others, see ICC v. Chicago, R. I. & P. Ry., 218 U.S. 88, 109, 30 S.Ct. 651, 54 L.Ed. 946, 957 (1910), and cases cited therein; see also Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938), subsequent decisions of the Supreme Court have substantially modified that rule insofar as review of administrative agency decisions is concerned. Thus, in FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940) the Court held that a competitor who was subject to adverse economic consequences as a result of an agency decision had standing under § 402(b) of the Federal Communications Act to contest the validity of an FCC order granting a new license to a competing station.

---

the object of providing relief in cases of general epidemic, pestilence, or other calamitous visitation; and, in the case of overseas or foreign air transportation, to such other persons and under such other circumstances as the Board may by regulations prescribe. Any air carrier or foreign air carrier, under such terms and conditions as the Board may prescribe, may grant reduced-rate transportation to ministers of religion on a space-available basis." 49 U.S.C. § 1373 (1964).

\* \* \* \* \*

Carrier's Duty to Provide Service, Rates, and Divisions

"Sec. 404(a) It shall be the duty of every air carrier to provide and furnish interstate and overseas air transportation, as authorized by its certificate, upon reasonable request therefor and to provide reasonable through service in such air transportation in connection with other air carriers; to provide safe and adequate service, equipment, and facilities in connection with such transportation; to establish, observe, and enforce just and reasonable individual and joint rates, fares and charges, and just and reasonable classifications, rules, regulations, and practices relating to such air transportation; and in case of such joint rates, fares, and charges, to establish just, reasonable, and equitable divisions thereof as between air carriers participating therein which shall not unduly prefer or prejudice any of such participating air carriers."

Discrimination

"(b) No air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic in air transportation in any respect whatsoever or subject any particular person, port, locality, description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." 49 U.S.C. § 1374 (1964).

■ The scope and the nature of the action brought by a competitor to obtain judicial review of agency action was further defined in Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942) and FCC v. NBC (KOA), 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943). Those decisions made it clear that a competitor was empowered to challenge agency action as contrary to law, and that the competitor was vindicating the public interest and right rather than his own. His status as a competitor and the harm to which the agency action subjected him gave him the standing to seek judicial review, but in so doing he was acting for the public benefit. The rationale supporting the competitors right to bring such actions was fully explored and analyzed by Judge Frank in Associated Indus. v. Ickes, 134 F.2d 694 (2 Cir. 1943). It is unnecessary to belabor the question here. It suffices to observe that it is now a well established doctrine of broad application in the law of standing. See National Coal Ass'n v. FPC, 89 U.S.App. D. C. 135, 191 F.2d 462 (1951); see generally, 3 Davis, Administrative Law Treatise § 22.05 (1958).

■ Section 1006(a) of the Federal Aviation Act of 1958, 49 U.S.C. § 1486 (1964) provides that "Any order, affirmative or negative, issued by the Board * * * under this Act * * * shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition * * * by any person disclosing a substantial interest in such order." Although the wording of this section varies from that of § 402(b) (2) of the Federal Communications Act[15] under which Sanders Bros. was decided, we think it is broad enough to confer standing on the petitioners under the teachings of Sanders Bros. Cf. Alton R.R. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586, (1942); The Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924); National Coal Ass'n. v. FPC, supra, Seatrain Lines, Inc. v. United States, 152 F.Supp. 619 (Del.1957).

■ Further, we believe that in the context of § 403(b) and 404(b) the petitioners have demonstrated, under the facts and in the circumstances of this case, a sufficient harm to the traveling public to warrant review. Thus, we find *Flying Tiger* factually distinguishable. The petitioners assert that the tariffs approved by the Board are uneconomic and unjustly discriminatory. To the extent that these allegations are established, a harm to the traveling public is established.[16] Rates which are unjustly discriminatory violate the provisions of § 404(b) and result in the very harm it was designed to prevent. An unjustly discriminatory rate affords favored service to those eligible under the tariff, and deprives those not eligible of equal treatment. In addition, rates that are uneconomic and unreasonable injure the traveling public either by jeopardizing the financial stability of the air carriers,[17] or by forcing those persons not eligible to travel at the reduced rate to

15. Compare, § 10(a) of the Administrative Procedure Act which reads:

"(a) Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof." 5 U.S.C. § 1009(a) (1964).

16. Whether they have stated sufficient facts to require the Board to investigate and suspend the tariffs is the essence of the issue before us and is discussed hereinafter.

17. The government argues that the airlines would not propose the tariffs if they did not improve the air carrier's financial position. The history of both the Interstate Commerce Commission and the CAB demonstrates that such is not always the case. Both regulatory agencies were established, in part, to avoid destructive competition resulting from actual or threatened price wars and both agencies have had to exercise their powers in this area. See ICC v. New York, N.H. & H.R.R., 372 U.S. 744, 758, 83 S.Ct. 1038, 10 L.Ed.2d 108, 118 (1963); Air Freight Rate Investigation, 9 C.A.B. 340 (1948).

bear a greater and undue portion of the costs of operation. This shifting of operating costs results in placing an oppressive burden on the portion of the public not afforded the reduced rates. Therefore, it seems abundantly clear that the petitioners have alleged sufficient harm to the public to justify judicial review of the action of the Board.

## II.

The regulatory scheme created by the Civil Aeronautics Act of 1938, 52 Stat. 973, 977, and subsequently re-enacted in the Federal Aviation Act of 1958, 72 Stat. 731,[18] applicable in this proceeding, is incorporated in sections 403 and 404. As previously indicated, these sections infuse the "rule of equality" into the regulatory policy controlling rates in the air transportation industry. Section 403(a) provides that all rates and fares charged by an air carrier for air transportation to any point served by it shall be filed with the Board. The first sentence of § 403(b) precludes an air carrier from charging any rate, fare, or from offering any rebate, dispensation, or free transportation, except as provided by a tariff filed with the Board pursuant to § 403(a). The second sentence of the section permits the air carriers, subject to terms and conditions established by the Board, to give free or reduced-rate transportation to certain enumerated classes of persons, generally those closely connected with the air carrier. Section 404(a) requires the air carriers to serve all those who reasonably request air transportation at reasonable rates and in a reasonably safe and adequate manner. Unjust discrimination, unreasonable preference or prejudice against passengers, shippers, terminals. or points served are precluded by § 404(b).

■■ The Board is empowered and charged under § 1002 [19] with the respon-

---

**18.** The re-enactment of the Civil Aeronautics Act of 1938 by the Federal Aviation Act portended no change in policy or interpretation, but was re-enacted for the convenience of the legislative draftsmen of the FAA. See, e. g., H.Rep. No. 2360, 85th Cong., 2d. Sess., 10–11 (1958), U.S.Code Cong. & Admin.News 1958, p. 3741.

**19.** Section 1002 provides in pertinent part as follows:

"Sec 1002. (a) Any person may file with the Administrator or the Board, as to matters within their respective jurisdictions, a complaint in writing with respect to anything done or omitted to be done by any person in contravention of any provisions of this Act, or of any requirement established pursuant thereto. If the person complained against shall not satisfy the complaint and there shall appear to be any reasonable ground for investigating the complaint, it shall be the duty of the Administrator or the Board to investigate the matters complained of. Whenever the Administrator or the Board is of the opinion that any complaint does not state facts which warrant an investigation or action, such complaint may be dismissed without hearing."

\* \* \* \* \*

"(g) Whenever any air carrier shall file with the Board a tariff stating a new individual or joint (between air carriers) rate, fare, or charge for interstate or overseas air transportation or any classification, rule, regulation, or practice affecting such rate, fare, or charge, or the value of the service thereunder, the Board is empowered, upon complaint or upon its own initiative, at once, and, if it so orders, without answer or other formal pleading by the air carrier, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, or charge, or such classification, rule, regulation, or practice; and pending such hearing and the decision thereon, the Board, by filing with such tariff, and delivering to the air carrier affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such tariff and defer the use of such rate, fare, or charge, or such classification, rule, regulation, or practice, for a period of ninety days, and, if the proceeding has not been concluded and a final order made within such period, the Board may, from time to time, extend the period of suspension, but not for a longer period in the aggregate than one hundred and eighty days beyond the time when such tariff would otherwise go into effect; and, after hearing, whether completed before or after the rate, fare, charge, classification, rule, regulation or practice goes into effect, the Board may make such order with

sibility of enforcing the foregoing requirements as well as other provisions of the Act. Section 1002 gives the Board the power, either upon the filing of a complaint or on its own motion, to suspend and investigate tariffs when there is a reasonable ground to believe that a violation of the Act has been established. Under the language of the section, the Board has broad discretionary powers with respect to whether to investigate or suspend a tariff, Nebraska Dept. of Aeronautics v. CAB, 298 F.2d 286 (8 Cir. 1962), and it may dismiss, without a hearing, a complaint which is valid on its face when "it is of the opinion that it does not state facts which warrant investigation." Flight Eng'rs. International Ass'n. v. CAB, 118 U.S.App. D. C. 112, 332 F.2d 312 (1964). On petition for review, the scope of a reviewing court's power is limited to a determination of whether the Board has abused its discretion. Pan American-Grace Airways, Inc. v. CAB, 85 U.S.App.D.C. 297, 178 F.2d 34 (1949). Thus, we are simply to determine whether the Board, in dismissing the complaints without a hearing, abused its discretion in concluding that the complaints failed to set forth sufficient facts to demonstrate that the tariffs in question violated the provisions of the FAA and did not require an investigation and possible suspension to protect the public interest.[20]

█ In dismissing the complaints the Board issued an order in each of the cases consolidated in this proceeding. The orders set forth the Board's reasons for denying the petitioners the relief they sought. Since the complaints could be dismissed without a hearing, the order need only comply with the requirements of § 6(d) of the Administrative Procedure Act, 5 U.S.C. § 1005(d), and not with the more stringent requirements of § 8(b), 5 U.S.C. § 1007(b). We find that these orders more than meet the procedural requirements of § 6(d), and further or more elaborate findings were not required. It should be noted, however, that in determining whether the Board abused its discretion in dismissing the complaints, we are limited to the orders actually issued, and the rationale advanced therein. It is on the basis of these findings and rationale that we are to test the exercise of discretion by the Board.

The petitioners contend first that reduced-rate transportation may be offered only to persons in those classes listed in § 403(b), and that reduced rates to any other class of persons is illegal per se. They assert that in enumerating the classes of persons to whom reduced rates may be granted, Congress intended to prohibit the granting of reduced rates to any other class of persons or any other traffic when the reduced-rate is offered on the basis of the identity or status of the traffic. Petitioners further urge since neither military personnel nor youths between ages of 12 and 22 are included in the classes of persons listed in § 403(b), the rates here in question are unlawful. The Board argues that § 403(b) permits air carriers to grant reduced rate transportation to those classes of persons listed in the section relatively free of Board control. In granting such transportation, it continues, an air carrier need not satisfy the requirements of § 404(b) and rates offered such persons may not be found violative of the strictures of § 404 (b). However, the Board contends that § 403(b) is not exclusive and that it does

reference thereto as would be proper in a proceeding instituted after such rate, fare, charge, classification, rule, regulation, or practice had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed rate, fare, charge, classification, rule, regulation or practice shall go into effect at the end of such period: Provided, That this subsection shall not apply to any initial tariff filed by any air carrier." 49 U.S.C. § 1482(a), (g) (1964).

20. In Pan American-Grace Airways v. Civil Aeronautics Board, 85 U.S.App.D.C. 297, 178 F.2d 34 (1949) the court characterized the action of the Board in such cases as "a ruling tantamount to a court's order sustaining a demurrer to a petition or complaint."

not preclude the offering of reduced-rate transportation to other persons, provided such transportation complies with the requirements of § 404(b). Thus, the list of persons to whom reduced-rate transportation may be given is illustrative and not exclusive.

The petitioners base their contention mainly on the 1956 amendment to § 403(b) which permitted reduced-rate transportation on a standby basis to members of the clergy, and the refusal of Congress in 1959 to amend § 403(b) to permit reduced-rate transportation to military personnel. They assert that in both instances it was the understanding of Congress that reduced-rate transportation must be construed to be exclusive in groups without an amendment of the statute.[21] Thus, they conclude, the section must be construed to be exclusive in order to effectuate this clear manifestation of Congressional interpretation of the statute.

As indicated earlier, reduced-rates for military personnel were permitted under Board regulation issued pursuant to § 403(b) for travel to Alaska and Hawaii. However, when these territories became states, travel between them and the continental United States was no longer "overseas" transportation, but became interstate transportation. As a result the Board could no longer authorize reduced-rates since the provision of § 403(b) granting the Board authority to regulate overseas transportation was no longer applicable. To enable the air

carriers to continue giving the reduced rates, the Board sought Congressional action in the form of an amendment to § 403(b).[22] Congress refused to alter the section. From this refusal to act, and the earlier amendment with respect to members of the clergy,[23] the petitioners infer that reduced rates may only be offered to those persons listed in § 403(b). We do not think such a conclusion need be drawn from either the amendment or from the refusal of Congress to amend the section.

When § 403(b) was amended to permit reduced-rate service for members of the clergy and at the time the Board sought the amendment to allow the giving of reduced-rates to military personnel, a substantial question was raised, as it is now, whether air carriers could, consistent with § 404(b), offer such transportation.[24] Prior to 1959 the Board had taken an extremely stringent line in enforcing the unjust discrimination provisions of § 404(b). See Capital Group Student Fares, 25 C.A.B. 280 (1957); Free and Reduced Rate Transp. Case, 14 C.A.B. 481 (1951); Tour Basing Fares, 14 C.A.B. 257, 259 (1951); Summer Excursion Fare Case, 11 C.A.B. 218 (1950); ATC Fare Discounts, 29 C.A.B. 1344 (1959). On the basis of this decisional law, and the approach of the Board to the problems of unjust discrimination, the Board might well have concluded that such reduced fares were likely to be unjustly discriminatory. Therefore, in order for the air carriers

21. Hearings on Airlines Fares for Ministers Before the House Subcomm. on Interstate & Foreign Commerce, 84th Sess.2d Sess. 2, 3, 5 (1956); H.R.Rep. No. 2183, 84th Cong., 2d Sess. 1 (1956); S.Rep. No. 1281, 86th Cong., 2 Sess. 3, 9 (1958); Hearings Before Subcomm. of the House Comm. on Interstate & Foreign Commerce on Airline Pass. Privileges, 86th Cong., 1st Sess. 12, 14 (1957); Hearings Before the Aviation Subcomm. of the Senate Comm. on Interstate & Foreign Commerce, 86th Cong., 2d Sess. 3, 20 (1958).

22. The Board actually sought an amendment which would permit the giving of reduced rates to military personnel for

travel anywhere in the United States. The Senate adopted a bill which would have permitted the reduced rates only for travel to Hawaii or Alaska, S.Rep. No. 1281, supra note 21, but the provision was killed in the conference committee. 106 Cong.Rec. 14770–71 (1960).

23. The Board opposed the inclusion of members of the clergy in § 403(b) on policy grounds. See Hearings Before the Subcomm. of the House Comm. on Interstate Commerce on Airline Fares for Ministers, 84th Cong., 2d Sess. 2–4, 9–11 (1956).

24. The Board had held reduced fares for ministers was violative of § 404(b). Hearings, supra, note 23, at 21.

to offer such rates an amendment to § 403(b) would have been required. Viewed in this context, the refusal of Congress to amend the section does not require us to construe the section as an exclusive limitation on the granting of reduced-rates. Rather, it merely indicates that where a reduced rate is violative of § 404(b), the class of persons to ·whom the rate is offered must be among the enumerated classes in § 403(b). This analysis comports with the interpretation of the section by the Board as it indicates that reduced rates may be offered to the classes listed in § 403(b) with impunity and irrespective of any possible violation of § 404(b). Thus, we conclude that the legislative history of the Board's unsuccessful attempt to amend § 403(b) does not vitiate, but rather strengthens, the construction of § 403(b) and 404(b) by the Board. See American Trucking Ass'n v. Atchison, T. & S. F. Ry., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (May 29, 1967).

 Further, the Board has consistently reviewed under § 404(b) tariffs which proposed reduced-rates for groups or classes or persons not included in the § 403(b) listing, e. g., Nonpriority Mail Rate Case, 34 C.A.B. 143 (1961); Certified Air Carrier Military-Tender Investigation, 28 C.A.B. 902 (1959); Capital Group Student Fares, 26 C.A.B. 451 (1958), and early held that § 403(b) was not an exclusive list of persons to whom reduced-rate transportation may be afforded. Airline Pass Agreement, 1 C.A.B. 677 (1940) (Dictum); ATC (1956) (concurring opinion); American Resolutions re Travel Agents & Tour Conductors, 31 C.A.B. 990, 992 (1959).[25] While the construction of an enabling statute by an administrative agency is not binding on the courts, it is entitled to great weight. Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124, 125 (1944); United States v.

American Trucking Ass'n., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). It is the interpretation of the intent of Congress by those charged with effectuating that intent. In addition, the administrative agency is continually involved and vitally concerned with the operation of the statute; the expertise developed through its intimate contact with the problems of the area and the operation of the statute should not lightly be ignored. See American Airlines, Inc. v. C.A.B., 97 U.S.App.D.C. 324, 231 F.2d 483, 488 (1956) (concurring opinion); American Airlines, Inc. v. CAB, 178 F.2d 903 (7 Cir. 1949). In the instant case the Board's construction of the statute is not only a reasonable one but it is generally consistent with the construction given the analogous section 22 of the Interstate Commerce Commission Act, 49 U.S.C. § 22 (1964); see Nashville C. & St. L. Ry. v. State of Tennessee, 262 U.S. 318, 43 S.Ct. 582, 67 L.Ed. 999 (1923); ICC v. Baltimore & O.R.R., 145 U.S. 263, 12 S.Ct. 844, 36 L.Ed. 699 (1892); Tennessee Prod. & Chem. Corp. v. Louisville & N.R.R., 319 I.C.C. 497 (1963). Since the Civil Aeronautics Act of 1938 was modeled after the I.C.C. Act, the latter provides an appropriate guide in construing the section before us. Cf. American Airlines, Inc. v. North American Airlines, Inc., 351 U.S. 79, 82, 76 S.Ct. 600, 100 L.Ed. 953, 960 (1956); ICC v. Delaware, L. & W. R.R., 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448 (1911). In discussing the interpretation to be given to section 22 in relation to sections 2 and 3 of the Act, the portions of the Act analogous to § 404, the Supreme Court said:

"The unlawfulness defined by sections 2 and 3 consists either in an 'unjust discrimination' or in an 'undue or unreasonable preference or advantage,' and the object of section 22 was to settle beyond all doubt that the dis-

---

25. The Board in two cases intimated in preliminary orders that § 403(b) was exclusive, ATC Fare Discounts, 29 C.A.B. 1344 (1959); ATC Tour Conductor's Fare Transp., 29 C.A.B. 1345 (1959), but in the final order it rejected that construction. ATC Resolution re Travel Agents and Tour Conductors, 30 C.A.B. 1552 (1960).

crimination in favor of certain persons therein named should not be deemed unjust. It does not follow, however, that there may not be other classes of persons in whose favor a discrimination may be made without such discrimination being unjust." ICC v. Baltimore & O.R.R., supra, 145 U.S. at 278, 12 S.Ct. at 848, 36 L.Ed. at 704.

It is therefore clear that the construction of the analogous section 22 is consistent with the Board's construction of section 403(b).

Although section 22 of the I.C.C. Act specifically provides for reduced rate transportation for military personnel, we do not think that fact undermines the correctness of the construction of section 403(b) advanced by the Board. Military personnel were included in section 22 by way of amendment after the railroads had offered reduced rate transportation to servicemen. The section was amended to insure the continuance of such transportation by precluding any determination that the reduced rates violated section 2 or 3 of the Act. See S Rep. No. 1141, 78th Cong., 2d Sess. 2 (1945); 90 Cong.Rec. 7385 (1944). That Congress believed it necessary to include the provision in the section does not indicate that § 403 is exclusive.

Nor do we believe that either Slick Airways, Inc. v. United States, 292 F.2d 515, 154 Ct.Cl. 417 (1961), or United States v. Associated Air Transp., Inc., 275 F.2d 827 (5 Cir. 1960) challenge the construction advanced by the Board. In both *Slick* and *Associated* the issue was whether the government was bound, under its contract with the air carriers for the carriage of military goods and personnel, by the tariff filed by the air carriers pursuant to § 403(a). The Court in both instances held that the tariff was controlling and the government was bound under its contract to pay the tariff rates. The cases are factually and legally distinguishable; they do not aid in the resolution of the issue before us.

We agree with the conclusion of the Board that § 403(b) merely permits the granting of reduced-rate transportation to the classes of persons enumerated in the section without regard to whether such rates meet the requirements of § 404(b), and does not preclude the giving of discriminatory rates in a proper case to other classes of persons. The limitation on such discriminatory rates is contained in § 404(b). This construction of the sections accords with common sense and produces a reasonable and rational result. The legislative history of the amendments to § 403(b) do not require a different construction. Accordingly, we conclude that the tariffs here in question are not unlawful because the persons to whom the reduced-rate transportation is offered are not listed in § 403(b). Flying Tiger Line, Inc. v. CAB, 121 U.S.App.D.C. 332, 350 F.2d 462 (1965); American Airlines, Inc. v. CAB, 178 F.2d 903 (7 Cir. 1949).

### III.

We turn now to the major issue raised by these petitions for review: whether the Board, in dismissing the petitioners' complaints without a hearing, abused its discretion in concluding that the complaints failed to set forth sufficient facts to warrant investigation of whether the tariffs here in question were unjustly discriminatory. The Federal Aviation Act of 1958 does not define the term unjust discrimination, but it is acknowledged that the term refers to section 2 of the Interstate Commerce Commission Act which precludes different treatment of like traffic for like and contemporaneous service under substantially similar circumstances and conditions. Wight v. United States, 167 U.S. 512, 42 L.Ed. 258, (1897); ICC v. Delaware, L. & W.R.R., 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448 (1911); Summer Excursion Fares, 11 C.A.B. 218 (1950). Such discrimination may result from the charging of different rates to different shippers or passengers afforded the same service, Wight v. United States, supra; International Air Freight Forwarders Investigation, 27 C.A.B. 658

(1958), or from the offering of special services to only a select patron or group of patrons. Baltimore & O. R. R. v. United States, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318 (1930); Seaboard Air Line Ry. v. United States, 254 U.S. 57, 41 S.Ct. 24, 65 L.Ed. 129 (1920); Capital Group Student Fares, 25 C.A.B. 280 (1957). In either situation, the result is that the carrier is giving preferential treatment to one person or group of persons to the prejudice of another, and contrary to the requirement that all those who seek the service of a carrier must be treated equally.

For a tariff to be unjustly discriminatory the service offered to a limited class of persons must be rendered under substantially similar circumstances and conditions as the service rendered to those not eligible under the tariff. The petitioners contend that in determining whether the circumstances and conditions of service are substantially similar the Board may consider only those factors which are directly related to carriage such as cost of service. Thus, they assert that the existence or extent of competition, the social desirability, the military need, or factors relating to the status of the traffic are irrelevant since they are not directly related to carriage. Therefore, such factors can not be used as a basis for justifying a discriminatory tariff on the ground that the circumstances and conditions of service are not substantially similar. The Board, on the other hand, argues that all the factors reasonably related to the tariff, including the public welfare, the good of the air carriers, the interest of the communities served, the competitive situation, and the needs of national defense may be considered in determining whether a rate is unjustly discriminatory. We think the petitioners' position does not go far enough, and the Board's position goes too far.

The early decisions of the Supreme Court construing sections 2 and 3 of the ICC Act drew a distinction between the sections as to the factors which may be considered in determining whether the circumstances and conditions of service were substantially similar.[26] ICC v. Alabama M. Ry., 168 U.S. 144, 18 S.Ct. 45, 42 L.Ed. 414 (1897). The Court construed section 2 to apply only to situations where persons utilizing the same route were subjected to disparate treatment, and therefore concluded that factors unrelated to costs of transportation could not be considered in determining whether the circumstances and conditions were substantially similar. Wight v. United States, supra; ICC v. Delaware, L. & W.R.R., supra; ICC v. Baltimore & O. R. R., 225 U.S. 326, 32 S.Ct. 742, 56 L.Ed. 1107 (1912); Seaboard Airlines Ry. v. United States, supra; Louisville & N.R.R. v. United States, 282 U.S. 740, 51 S.Ct. 297, 75 L.Ed. 672 (1931). Thus, reduced rates for groups of ten or more ticketed as a group were held not unjustly discriminatory as the reduction was reasonably related to the reduced costs of transportation, ICC v. Baltimore & O. R. R., 145 U.S. 263, 12 S.Ct. 844, 36 L.Ed. 699 (1892), but the granting of extra services for one shipper and not for another was held illegal even though competitive considerations necessitated the granting of those added services. Wight v. United States, supra. Section 3, however, was given a broader construction. The Court construed the section to apply to the treatment of different localities and persons in such a manner as to favor one locality or community and the

---

26. Section 3 prohibits undue preference and prejudice and differs from the unjust discrimination proscribed by section 2 in that it deals with the disparate treatment of localities as well as persons in such a manner as to prejudice one in favor of another. Thus, the charging of a greater rate for a shorter distance, or the charging of a different rate for substantially equal distances so that traffic is diverted from one person or locality to another falls within the purview of section 3 prohibitions. See ICC v. Alabama M. Ry., supra; Texas & P. Ry. v. ICC, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940 (1896); Cf. Texas & P. Ry. v. United States, 289 U.S. 627, 53 S.Ct. 768, 77 L.Ed. 1410 (1933).

people therein over another. Since the section is concerned with the relationship of the carrier with persons and communities in varying localities and situations, the Court held that the Commission could consider competition and the other factors which normally are relevant in determining rates in deciding whether the circumstances and conditions attending the service of these communities were substantially similar. Texas & P. Ry. v. ICC, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940 (1897);[27] ICC v. Alabama M. Ry., supra; United States v. Illinois Central R.R., 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417 (1924). However, as the regulatory pattern under the ICC Act developed, the factors which would justify disparate treatment under section 3 were limited to competition and factors directly relating to the cost of carriage or transportation. Compare Texas & P. Ry. v. ICC, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940 (1897) and Alabama M. Ry. v. ICC, supra, with United States v. Illinois C.R.R., supra, and Nashville, C. & S. L. Ry. v. State of Tennessee, 262 U.S. 318, 43 S.Ct. 583, 67 L.Ed. 999 (1923).

When the jurisdiction of the ICC was increased to include water carriers and motor carriers, this rigid distinction between the factors relevant under section 2 and those relevant under section 3 lessened, and competitive factors were considered under section 2 in determining whether the circumstances and conditions were substantially similar. Baltimore & O. R. R. v. United States, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318 (1938); Eastern-Central Motor Car-

riers Ass'n. v. United States, 321 U.S. 194, 64 S.Ct. 499, 88 L.Ed. 668 (1944). The existence of competition was to be considered in light of the National Transportation Policy and the ICC was enjoined to preserve the inherent advantages of each form of transportation. ICC v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102 (1947); ICC v. New York, N.H. & H.R.R., 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963); Cf. United States v. Pennsylvania R.R., 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499 (1945). But even then, discrimination motivated by the competition of other forms of transportation remained unjustly discriminatory if uneconomic and destructive of the inherent advantages of the competing form of transportation. ICC v. Mechling, supra; United States v. Pennsylvania R.R., supra; see ICC v. New York, N.H. & H.R.R., supra. While competition became a relevant factor in determining whether a rate was unjustly discriminatory, the full panoply of policy considerations which might bear on the reasonableness of a discriminatory rate classification, and which the Board argues it may consider, were not appendaged to the factors which are relevant in determining if a rate is unjustly discriminatory, or unduly preferential and prejudicial.

■ It is against this background of rate regulatory policy that we approach the issue of what factors the Board may consider in determining whether a tariff is or is not unjustly discriminatory because the circumstances and conditions are or are not substantially similar. The weight to be given the various factors in

---

**27.** While Texas & P. Ry. v. ICC, supra, appears at first blush to be a case of unjust discrimination, it actually involved undue preference and prejudice. See ICC v. Alabama M. Ry., supra. The decision sanctioned lower rates for the carriage of foreign cargo traveling pursuant to rates set from the point of departure to the point of destination, than rates charged for domestic cargo. To that extent, therefore, it would appear to be a case of unjust discrimination. However, the complaint had been filed with the ICC by the New York Board of Trade & Transportation alleging that cargo arriving via the Port of New Orleans for western cities was transported at a lower rate than that charged for the carriage of goods via the Port of New York and destined for points west. Thus, the issue was whether the reduced rates unduly prejudiced the Port of New York to the preference of the Port of New Orleans. The Court, in holding that they did not, focused on the competition that existed from shipping with respect to the western cities.

a particular case is a matter for the Board, United States v. Chicago Heights Trucking Co., 310 U.S. 344, 60 S.Ct. 931, 84 L.Ed. 1243 (1940), but the factors which are to be considered is a question of statutory interpretation and consequently is for the courts as well as the Board. See Eastern-Central Motor Carrier Ass'n v. United States, supra; ICC v. New York, N.H. & H. R. R., 372 U.S. 744, 83 S.Ct. 1038, 10 L.Ed.2d 108 (1963).

Although the judicial interpretation given the Interstate Commerce Commission Act is relevant in determining what factors the Board is to consider under § 404(b) of the FAA, there are fundamental statutory differences between the ICC Act and the FAA which effect the factors which are material in deciding whether the circumstances and conditions of service are substantially similar. The ICC is charged with regulating three competing modes of transportation in accordance with the national transportation policy, and must insure the adequacy of each of the modes to meet the needs of the national defense. ICC v. New York, N.H. & H.R.R., supra, 372 U.S. at 761–764, 83 S.Ct. 1038, 10 L.Ed.2d at 120–121. The Board, on the other hand, is solely concerned with the needs of air transportation and it need not specially consider the impact of tariffs on competing surface or water carriers. New York-Florida Case, 24 C.A.B. 94, 119–20 (1956); Northeast Airlines, Consolidation of Routes, 6 C.A.B. 541, 545–46 (1945). See Flying Tiger Line, Inc. v. CAB, 121 U.S.App. D.C. 332, 350 F.2d 462 (1965). In addition, the organic statute of the Board sets forth certain factors and objectives which the Board is enjoined to consider in exercising its regulatory function. American Airlines, Inc. v. CAB, 89 U.S. App.D.C. 365, 192 F.2d 417 (1951).

But neither the differences between the statutes, nor the enumeration of relevant factors in the FAA gives the Board license to resort to the full spectrum of broad social policy considerations which might rationally bear on the issue of whether the circumstances and conditions of service are substantially similar. Cf. Western Airlines, Inc. v. CAB, 347 U.S. 67, 74 S.Ct. 347, 98 L.Ed. 508 (1954); American Overseas Airlines, Inc v. CAB, 103 U.S.App.D.C. 41, 254 F.2d 744 (1958). Rather, the spectrum is limited to those factors which Congress has by statute deemed material, and those factors which regulatory practice in the transportation industry has, through experience, found relevant. For while the Board has acquired an expertise in matters relating to air transportation, that expertise does not extend to and include all the social policy factors which it here argues it may evaluate and consider. The implementation of social policy on a broad and expansive scale is, within the Constitutional framework, a matter for Congress. While Congress may delegate to an administrative body, under appropriate guidelines, the actual implementation and execution of a general social objective incorporated in a statute, an intent to commit such matters to the agency must appear either explicitly or by necessary implication in the enabling statute. We are unable to find such delegated authority which would enable the Board to consider social policy factors which are not incorporated in the Federal Aviation Act or which have not been deemed relevant in the course of the history of rate regulation in the transportation industry.

Thus, rather than conferring upon the Board the authority to implement and effectuate social policy on a general scale, the factors which the FAA requires the Board to consider are closely related to the air transportation industry. Under section 102 of the Act the Board is directed to encourage and develop the air transportation industry, to preserve the inherent advantages of travel by air, and to promote adequate, economical service at reasonable rates. The Board is enjoined to insure that rates are not unjustly discriminatory, unduly prejudicial or preferential, or the

product of destructive competition. The Board is also to assure the development of the industry to meet the needs of the postal service and the national defense. Similar provisions are made relevant in determining reasonable rates under section 1002(e). Both of these sections when read in the context of the statute as a whole make clear, however, that equality of treatment is paramount and that the factors are to be weighed in light of that pervasive requirement. Thus, the Board has recognized and held that neither the promotional aspect of a tariff nor the increased revenue produced by a tariff will justify an otherwise unjustly discriminatory tariff.

"The most favorable conclusion that could be drawn from the justification advanced by the carriers is that the tour basing fares will increase their net revenues. Conceding *arguendo* that the fares will increase the carriers' revenue, we must conclude that this, *in itself*, would not be a sufficient justification for a discriminatory fare. (Cf. the Hawaiian Common Fares Case, 10 C.A.B. 921, 927 (1950)).

In formulating a standard of unjust discrimination, the Congress did not intend to limit the Board to passing judgment on the business acumen of air carriers management and to require the Board to rule that a fare discrimination is justified in every case where the carrier may benefit therefrom. Nor did Congress intend that we were merely to guard against improvidence in reducing fares. We can not lose sight of the fact that the air carriers here involved are public utilities. And as a public utility, in return for the privilege of operating in a more limited competitive atmosphere as well as enjoying other benefits, an air carrier assumes certain obligations, one of which is the duty to provide service to all who request it on equally favorable terms. It is our opinion that this is the duty which Congress intended to underscore when it established the prohibition against unjust discrimination." Tour Basing Fares, 14 CAB 257, 258–59 (1951) (Emphasis in the orig.)

Accord, Free and Reduced-Rate Trans. Case, 14 C.A.B. 481 (1951). Thus, these factors, even though relevant, are not to be used as a mere camouflage for essentially disparate treatment of persons using the services of an air carrier. ICC v. Baltimore & O. R. R., 225 U.S. 326, 342, 32 S.Ct. 742, 56 L.Ed. 1107, 1112 (1912). The rule of equality is the very core and essence of the fare structure in the transportation industry, and it should not be rendered a meaningless phrase by the use of spurious jusifications for unjustly discriminatory rates.

IV.

Having laid this predicate, we come now to the factual controversy here presented. Initially, the parties discuss at great length whether the service offered under the military and youth tariffs is "like" service as compared with the service afforded regular fare passengers. The petitioners assert that the standby and "bumping" features do not sufficiently differentiate the service from regular fare service in light of the low level load factors existing on most flights. The Board concluded that the inconveniences attending the standby tariffs rendered the service "unlike" service,[28] and we believe those findings to be adequately supported. American Airlines Military Fares, 38 C.A.B. 1038 (1963). Thus, we are left solely with the question of whether the air carriers may validly offer the inferior and lower cost service to only a select group of persons without unjustly discriminating against the rest of the traveling public. The answer to that question depends on whether the circumstances

---

28. As evidence of the materiality of the inconvenience of the standby tariff, see H. Rep. No. 96, 89th Cong., 2d Sess. (1966). See generally Hearings Before the Special House Subcomm. of the Comm. on Armed Services on Commercial Air Transp. for Service Personnel while on Authorized Leave (1966).

and conditions are substantially similar. Merchants Warehouse Co. v. United States, 283 U.S. 501, 51 S.Ct. 505, 75 L.Ed. 1227, 1228 (1931); Reduced Fares for U. N. Employees, Order No. E-19519, Apr. 23, 1963; Caribair Airlines, Student Standby Fares, Order No. E-21667, Jan. 12, 1965. That test is the same as the test which must be met where service is "like" service. ICC v. Baltimore & O. R.R., 145 U.S. 263, 281, 12 S.Ct. 844, 36 L.Ed. 699, 705 (1892). In the latter situation, the discrimination is in charging different rates for the same service, while the discrimination raised by the standby tariffs results from its limitation to servicemen and youths between the ages of 12 and 22, thus denying the service to the general traveling public.[29]

There appears to be little question but that the service provided under the young adult tariff is "like" service as compared with that given regular fare passengers, and we do not read the Board's order as concluding otherwise. The tariff permits the making of reservations, and provides no dissimilarity in actual service. The requirement that an identification card be purchased yearly at a nominal cost is too slight a distinction to differentiate the service and appears to be more in the nature of a device to control abuse. Therefore, as to both standby tariffs and the young adult tariff, we must determine whether the Board abused its discretion in finding the circumstances and conditions of service substantially dissimilar.

Because of the substantial differences between the basis of the Board's action with respect to the military tariff and the youth and young adult tariffs, we shall treat the military tariff separately.

A. The Military Standby Tariff

In dismissing the complaints, the Board relied on its former decision which had approved the tariffs on a temporary basis. See American Airlines Military Fares, 38 C.A.B. 1038 (1963). It held that the interests of national defense, including the morale of the servicemen, the competition from surface carriers which offer reduced rate transportation to military personnel, the need to increase the amount of military traffic carried by the airlines, the promotional aspects of the tariff, and the increased utilization of equipment with a resulting improved profit picture were all factors which rendered the circumstances and conditions essentially dissimilar. The Board further argues before us that the granting of a discount to the government is not unjustly discriminatory as the benefit of the reduced rates inure to the public. It contends therefore that the policy considerations which justify reduced rates for the United States Government also applies to these tariffs.

In support of its position, the Board relies on its decision in Certificated Air Carrier Military-Tender Investigation, 28 C.A.B. 902 (1959). There the Board approved tariffs which provided for a reduction of 10% on first class rates for military personnel traveling at government expense on either chartered or regularly scheduled flights. The Board rested its decision on the competitive necessity created by the reduced-rates offered by surface carriers, and the decreased costs involved in transporting groups of military personnel. These factors, it concluded, rendered the circumstances and conditions of service dissimilar. Since the Board resolved the issue in the manner it did, the decision does not support the more general assertion raised here that reduced rates may be offered to military personnel as a general rule. Rather, it would seem to indicate that reduced rates

---

29. Historically, only the charging of different rates for like service was unjust discrimination, see 49 U.S.C. § 2 (1964), and the charging of different rates for different service to a limited class fell within the purview of section 3 as undue prejudice. Compare Wight v. United States, supra, with ICC v. Alabama, M. Ry., supra, and ICC v. Inland Waterways Corp., 319 U.S. 671, 63 S.Ct. 1296, 87 L. Ed. 1655 (1943). See also, L. T. Barringer & Co. v. United States, 319 U.S. 1, 63 S.Ct. 967, 87 L.Ed. 1171 (1943).

for servicemen must be justified on the same basis as other reduced rates, namely on the grounds that factors independent of their status as servicemen rendered the conditions of service dissimilar.

In addition, we do not believe the case stands for the proposition that reduced-rates may be granted to the United States Government because it is the government, since the Board specifically rejected that argument in reaching its conclusion. 28 C.A.B. at 911. See also Slick Airways, Inc. v. United States, 292 F.2d 515, 154 Ct.Cl. 417 (1961); United States v. Associated Air Transp. Inc., 275 F.2d 827, 833 (5 Cir. 1960). But even assuming that reduced rates for the United States government might be justified under § 404(b) purely on the basis of status, that does not serve to justify the tariffs here in question which are applicable to servicemen traveling at their own expense. The rationale which sanctions reduced rates for the government rests on the argument that the reduced rates lower the transportation costs of the government, and that that cost reduction inures to the public weal, see ICC v. Baltimore & O.R.R., 145 U.S. 263, 278, 12 S.Ct. 844 (1892). But here the cost of transportation is borne by the individual serviceman, and the government realizes no reduction in the cost of transportation.

 However, we do not read the Board's order as basing its decision on either of these factors. Rather, we approve the Board's conclusion that the reduced rates were justified by competitive considerations and that the tariff adapted the air transportation industry to the needs of the national defense.[30] The Board noted that surface carriers give reduced rates to military personnel

and that users of surface transportation at those rates were not subject to the inconveniences of standby service. It concluded that the tariffs were a reasonable means by which air carriers could effectively compete for military business. Further, reduced rates to servicemen traveling on furlough or leave enable them to spend less time in transit and thereby allow them to better utilize their furlough or leave time. The Board found on the basis of the assertions advanced by the Department of the Army that the reduced rates aided and increased the morale of the armed forces, thus contributing to the national defense. In so doing, the reduced rate tariffs permit the air carriers to better meet the needs of the national defense. Both competition and adapting the air transportation industry to the needs of national defense are considerations which may validly be weighed by the Board in determining whether a tariff is unjustly discriminatory, Certificated Air Carriers Military-Tender Investigation, supra; § 102 of the FAA, 49 U.S.C. § 1302 (1964), and we can not say that the Board abused its discretion in reaching the factual decision it did. American Trucking Ass'n v. FCC, 377 F.2d 121, D.C.Cir., Sept. 15, 1966, cert. den., 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874, (Feb. 27, 1967).

B. Youth Standby and Young Adult Tariffs

As to both these tariffs the Board concluded that the circumstances and conditions of service were dissimilar on the grounds that reduced rates for youths have traditionally been part of the transportation rate scheme, that the tariffs are a promotional device directed at a homogenous group of persons which because of its financial dependence does

---

30. In ICC v. New York, N.H. & H.R.R., 372 U.S. 744, 762, 83 S.Ct. 1038, 1049, 10 L.Ed.2d 108, 120 (1963), the Court, in a unanimous opinion dealing with an order of the I.C.C. stated with respect to consideration of the national defense:

"Nor can we conclude that the statutory references to such vital considerations as national defense are mere window dressing, without any practical significance in terms of the Commission's function. 'Congress unequivocally reserved to the Commission power to regulate reasonableness of interstate rates in the light of the needs of national defense.' United States v. Capital Transit Co., 325 U.S. 357, 362, 65 S.Ct. 1176, 1178, 89 L.Ed. 1663, 1668.

not normally use air transportation, that the reduced rate permitted a greater utilization of existing facilities, and that approval was consistent with the Board's policy of allowing airline management to exercise its discretion more freely. The petitioners contend that the tariffs can be justified only on the impermissible consideration of the status of the traffic, and are therefore unjustly discriminatory.

As noted earlier, reduced rates for children have traditionally been part of the rate scheme in the transportation industry, and they have never been attacked as unjustly discriminatory. The Board has, however, ruled that children under 12 who are not accompanied by an adult may be charged regular fare. Full Fares for Unaccompanied Children, 24 C.A.B. 408 (1956). In reaching that conclusion, the Board found that the costs of transportation was equal to that of adults, and therefore the airlines could charge them full fare. 24 C.A.B. at 410.[31] The Board argues here that the decision by necessary implication held that reduced rates for children under 12 are not unjustly discriminatory. We have examined the opinion with great care, and find it lacking in cogency. Consequently, we are extremely hesitant to rely on it for anything other than its exact holding. But we are not presented with the issue of whether the time-honored practice of giving reduced-rates for children under 12 is unjustly discriminatory.

The tariffs before us provide for reduced rates for youths between the ages of 12 and 22. The only way in which a determination that reduced rates for children under 12 are not unjustly discriminatory bears on the tariff before us is if such tariffs are not unjustly discriminatory because age is per se a distinguishing condition which, in and of itself, renders the conditions and circumstances of service dissimilar. We do not construe the Board's decision in Full Fares for Unaccompanied Children to stand for that proposition,[32] and on the basis of the history of rate regulation in the transportation industry, we do not believe such a proposition to be valid. While the ICC in two early cases did state in dicta that commutation tickets could be issued to children of school age, Commutation Tickets for School Children, 17 I.C.C. 144 (1909); Bitzer v. W-V. Ry., 24 I.C.C. 255 (1912), when read in the context of the decision itself and against the background of rate policy which required reduced rates to be available to all, we do not find those statements persuasive. Aside from being

---

31. The dissenting opinions argued most cogently that the comparison of costs was to be made against the costs of transporting accompanied children as the tariffs were unjustly discriminatory, if at all, because they discriminated against unaccompanied children in favor of the accompanied child. Since the evidence failed to demonstrate any cost variation between accompanied and unaccompanied children the dissenters concluded that the rates were unjustly discriminatory. 24 C.A.B. 415.

32. See Ozark Air Lines Senior Citizens Excursion Tariff, Order No. E–21973, Mar. 31, 1965; Mohawk Airlines "Golden Age Excursion Tariff," Order No. E–17111, July 6, 1961. Both these cases involved tariffs which provided for reduced rates for men over the age of 65 and women over the age of 62. In both cases the Board concluded that the tariffs appeared to be unjustly discriminatory in that they discriminated against those under 62. Investigation was ordered. In Ozark Air Lines the Board stated:

"On the basis of all facts and information before it, the Board concludes that Ozark's Senior Citizens tariff should be investigated. The tariff would apparently permit the like and contemporaneous transportation of persons at least 62 years of age under circumstances and conditions substantially similar to those under which persons less than 62 years old would be transported, but at greatly reduced fares. Absent any strong justification therefor, this situation appears to contain the elements of unjust discrimination, for no valid distinction between persons under 62 and those 62 and older has been brought to our attention."

Thus, it appears that the board has not viewed age, in and of itself, as a factor which renders the circumstances and conditions of service dissimilar.

dicta, the Commission disposed of the actual issue before it on the basis of its decision in In Re Party Rate Tickets, 12 I.C.C. 95 (1907) which held that reduced rates for party tickets could only be issued if they were available to all, and that factors relating to the type of passenger or his status could not be considered. Accord Smith v. Northern P. R.R., 1 I.C.C. 611 (1887);[33] see ICC v. Baltimore & O.R.R., 145 U.S. 263, 12 S.Ct. 844, 36 L.Ed. 699 (1892). Further, section 22 of the ICC Act excises commutation tickets from the unjust discrimination provisions of section 2. We therefore believe that the Commission's bare statement without analysis and in dicta is an insufficient predicate upon which to base such a radical departure from the general rules of rate making. In view of the absence of any logically supportable rationale consistent with the general limitations on the factors which are relevant to a determination of whether the circumstances and conditions of service are substantially similar, we are constrained to conclude that age alone is, as a general rule, not a relevant consideration. In so concluding we are not intimating that the time-honored exception for children under 12 is unjustly discriminatory. Rather, we limit our holding solely to the question as it concerns special services available only to those between the ages of 12 and 22.

When the Board dismissed the petitioners' complaints against the youth tariff, it noted that the tariff raised an issue of unjust discrimination in that it was applicable only to a limited age group. But it observed that the question of discrimination was merely one of degree, and concluded that limiting the tariff to those between the ages of 12 and 22 was reasonable and not arbitrary. It also found that it was necessary to limit the applicability of the tariff in order to preserve its promotional aspects because of the diversion from regular fare traffic which would otherwise result. Arguing that the question of unjust discrimination caused by a tariff limited in applicability on the basis of age is merely a question of degree does not aid in the analysis. All questions of discrimination under the Act are questions of degree as the statute only prohibits unjust discrimination. As indicated earlier, whether a discriminatory tariff is unjust is determined by whether the conditions and circumstances are substantially similar.

The Board here argues that extending reduced rates to those between the ages of 12 and 22 is justified as the classification corresponds to those youths who are still in school, frequently at great distances from home, and correspondingly in need of rapid transportation during the long holiday periods. The essential difficulty with this position is that it is predicated solely on the status of the traffic, and is unrelated to transportation. Further, it marks a radical departure from the Board's previous position as it has consistently held, to date, that students are not entitled to reduced rates merely because they are students. Capital Group Student Fares, 25 C.A.B. 280 (1957); Caribair Student Standby Fares, Order No. E-21667,[34] Jan. 12, 1965; Field Trip Group Fare for School Children, Order

---

33. But see James C. Savory & Co. v. New York, C. & H. R.R., 2 I.C.C. 210 (1888) which sanctioned special rates for immigrants. In that case, however, the immigrants were under the care of a special New York State Commission on emigration, they were ticketed through the commission, traveled in special cars (some of which were sufficiently inferior to require remedial action by the ICC), and frequently went via special trains which returned to the point of origin empty. Accordingly, we find the case factually distinguishable, and inapposite.

34. In its order, dated 12 Jan. 1965, the Board stated:
Special discount fares for students have come under the Board's scrutiny on two previous occasions. In Capital Group Student Fares, 25 CAB 280 (1957), a discount fare applicable to student groups of 25 or more was found to be unjustly discriminatory. The Board then pointed out in its opinion that

No. E-19599, May 21, 1963. Finally, the argument is postulated on a factual assertion that is clearly contradicted by the record. The tariffs are not available during the peak holiday travel periods of Easter, Thanksgiving, Christmas, and New Years. These traditional holiday periods correspond generally to the long vacation periods afforded college students. Thus, during the period in which the Board argues the reduced rates are needed, they are not available. We are therefore forced to conclude that the orders of the Board dismissing the complaints not only can not be supported by these considerations dealing with the status of those eligible under the tariff, but are not supported by the arguments advanced by the Board.

Nor do we believe that requiring the tariff to be limited in order to preserve its promotional aspects lends added support to the orders here under review. This is little more than arguing that promotion is a valid consideration in determining whether a tariff is unjustly discriminatory. Limiting the class of persons eligible under the tariff is merely a means of securing that added factor in the ultimate determination. While the Board is charged with promoting the air transportation industry, it is doubtful, in view of the specific statutory language prohibiting unjust discrimination and undue preference and prejudice, that promotion alone is a sufficient justification for an otherwise unjustly discriminatory rate. Heretofore, the Board has consistently held that the promotional aspects of a tariff alone did not render the circumstances and conditions of service dissimilar. Thus, it has held that the discriminatory aspect of reduced

rates were not counter-balanced by the promotional aspects of such reduced rates to students, Capital Group Student Fares, supra, to freight forwarders, International Airfreight Forwarders, 27 C.A.B. 658 (1958), to groups of two or more traveling on a group excursion plan, Group Excursions Fares, 25 C.A.B. 41 (1957),[35] to travel agents and tour conductors, Free & Reduced-Rate Transp. Case, 14 C.A.B. 481 (1951); ATC Resolution re Travel Agents & Tour Conductors, 23 C.A.B. 1552, 29 C.A.B. 1344, 29 C.A.B. 1345, 31 C.A.B. 900 (1959), to teachers, Frontier Airlines Reduced Fares for Teachers, 38 C.A.B. 1148 (1963), to U. N. Employees, Reduced Fares for U. N. Employees, Order No. E-19519, Apr. 23, 1963, and to men over 65 and women over 62, Ozark Air Lines Senior Citizen Excursion Tariff, Order No. E-21973, Mar. 31, 1965.[36] In those cases where the Board has found rate differentials not unjustly discriminatory, it has done so on the basis of transportation related factors and competition, and not solely on the promotional aspects of the tariff. Certificated Air Carrier Military-Tender Investigation, supra, (reduced rates were justified by reduced cost and competition); Capital Group Student Fares, 26 C.A.B. 451 (1958) [37] (Reduced rates for groups of 25 and over justified on the basis of lower costs); Deferred Airfreight Case, 23 C.A.B. 651 (1956) (different rate for deferred freight which was available to any shipper who was willing to wait the extra delivery time); Nonpriority Mail Rate Case, 34 C.A.B. 143 (1961) (reduced rates for the standby transportation of first-class mail).

'Congress has manifested no intent to favor students in air transportation.' More recently, Field Trip Group Fares for School Children proposed by United Air Lines were ordered suspended by E-19599, May 21, 1963."

35. See also IATA Agreement, Rate & Traffic Matters, Order No. E-11988, Dec. 12, 1957.

36. The Board permitted a senior citizen tariff to go into effect in Mohawk Airlines Golden Age Excursion Tariff, Order E-17111, July 6, 1961, but ordered an investigation of the tariff because of the unjust discrimination cause by the tariff.

37. Although titled student group fares, the tariff actually provided for reduced fares for any group of 25 or over irrespective of whether or not they were students.

██ ██ Thus, on the basis of the Board's own analysis in prior decisions, these tariffs may not be justified on the ground of their promotional aspects alone. Since we have concluded that in the circumstances here present neither age nor factors relating to the status of the traffic may be considered in determining whether the circumstances and conditions of service are substantially similar, the validity of the Board's order rests on the promotional effect of these tariffs. While the Board appears to have rested its decision on all of these elements, we do not think the orders before us may be justified solely on the promotional aspects of the tariffs. For even though the question of unjust discrimination is one of fact for determination by the Board, and while we recognize that the genius of the administrative practice is its adaptability and flexibility to the rapidly changing social and economic situation, see American Trucking Ass'n. v. Atchison, T. & S. F. Ry., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847, (May 29, 1967), we do not believe that such a radical change in policy can be justified without any evidentiary basis or rational justification. City of Lawrence v. CAB, 343 F.2d 583 (1 Cir. 1965).

Therefore, we set aside and reverse the orders of the Board in Cases No. 23,410, youth tariff, and 23,411, young adult tariff, and remand the cases to the Board for further proceedings not inconsistent with this opinion.[38]

### V.

██ ██ The petitioners finally assert that the tariffs in question are uneconomic and unreasonable in violation of § 404(b). They contend that the military standby tariff is uneconomic as it does not compensate the air carriers for the fully allocated costs of transportation. The Board held that while the tariff did not cover the fully allocated costs, it was not uneconomic because it met the profit impact test. That test essentially requires a fare to cover the out-of-pocket costs of carriage. Since the Board concluded that the air carriers were not scheduling on the basis of the military standby traffic, the tariff was not required to compensate the carriers for the fully allocated costs of transportation, but need only satisfy the profit-impact test. Pittsburgh-Philadelphia No-Reservation Fares, 34 C.A.B. 508 (1961). On the basis of the record before us, we can not say the Board abused its discretion in holding that the military standby tariff was economic as it was within the zone of reasonableness. Airfreight Rate Investigation-Directional Rates, 11 C.A.B. 228 (1950); Air Freight Rate Investigation, 9 C.A.B. 340 (1948).

In view of the fact that we are remanding the youth and young adult fare tariffs for further proceedings, we do not deem it appropriate to reach the question of whether those tariffs are uneconomic and unreasonable. We believe that the interests of justice will be better served if the entire matter of the youth and young adult fare tariffs remain open for further consideration by the Board.

The order of the Board in Docket No. 22,791, et al, refusing to investigate or suspend the military standby tariff is affirmed. The orders of the Board in Docket Nos. 23,410 and 23,411 refusing to investigate or suspend the youth and young adult fare tariffs are set aside and reversed and the cases are remanded to the Civil Aeronautics Board for such further proceedings as are appropriate under the Federal Aviation Act of 1958 and not inconsistent with this opinion.

Affirmed in part and reversed and remanded in part.

---

38. We do not think that limiting the applicability of the tariffs for one year eliminates the error in these orders. The inadequacy of the orders stems from an improper consideration of factors not relevant, and from an unexplained departure from past practice. Whatever information may be gained from a year's experiment will not aid in the resolutions of the problems nor cure the defect.